**SHEFFIELD DIVISION ARMCO STEEL CORPORATION, Appellant,**

**v.**

**Mrs. Walter O. JONES, Jr., et al., Appellees.**

**No. 14080.**

Court of Civil Appeals of Texas.

Houston.

May 2, 1963.

Two Motions for Rehearing Denied June 20, 1963.

**74**

Jack Binion, James E. Crowther, W. N. Blanton, Jr., Edward Clark, J. Sam Winters, Mary Joe Carroll, Clark, Thomas, Harris, Denius & Winters, Austin, Butler, Binion, Rice & Cook, Houston, of counsel, for appellant Sheffield Division, Armco Steel Corporation and cross-appellee, Robert McWhirter.

Newton Gresham and Sam W. Cruse, Houston, amici curiæ (In support of appellant).

J. Curtiss Brown, W. W. Watkins and W. James Kronzer, Houston, Hill, Brown, Kronzer, Abraham, Watkins & Steely, Houston, of counsel, for appellees.

COLEMAN, Justice.

This is a suit for exemplary damages growing out of an industrial accident authorized by Article 16, Sec. 26, of the Texas Constitution, Vernon's Ann.St. and Art. 8306, Sec. 5, Vernon's Annotated Texas Statutes.

Appellees are the survivors of Walter O. Jones, Jr., who was employed by appellant, Sheffield Division Armco Steel Corporation, as a motor inspector. Jones' death was caused by burns received while working. Appellant's liability for the death benefits provided by the Texas Workmen's Compensation Act was admitted and the prescribed payments have been and are being made.

Trial was to a jury which answered all issues in favor of appellees. Both appellant and its employee McWhirter were found guilty of acts of gross negligence proximately causing the accident. The jury found actual damages in the amount of $25,000.00 and assessed exemplary damages against appellant and McWhirter in the amount of $250,000.00. The trial court granted a motion for judgment non obstante veredicto as to McWhirter and entered judgment against appellant.

Appellant is engaged in the business of making steel. In the manufacturing process coke is required and it is produced in special furnaces by burning coal. Coke gas is drawn off as a by-product of this burning process. This gas is transported by means of large pipes to cooling areas and then to precipitators where some of the coal tars in the gas are removed by means of an electrical charge. The precipitators are located in what is known as the by-products area. Three precipitators performed the same function and were numbered 2, 3 and 4. After further procedures the gas is run through precipitator No. 5, which is of a different design. Precipitators 2, 3 and 4 were large tank-like structures approximately 35 feet high. The three were connected by a walkway some 12 to 15 feet above ground level. At the walkway level on the east and west sides of each precipitator were compartments, commonly called "ears," housing insulators and an "I" beam. Electrodes are suspended inside of the precipitators from a bar which extends from the insulator in the east ear to the insulator in the west ear.

When the precipitators are in operation the coke gas flows in from a large inlet pipe and out through an outlet pipe of the same size. While it is in the precipitators the gas is subjected to a charge of some 73,000 volts of electricity which causes coal tar to

be attracted to the electrodes and precipitator walls. The tar drains to the bottom and is removed. The precipitators are arranged in a battery and the gas can flow from one to the other through the outlet pipe. The inlet and outlet pipes are connected to the main body of the precipitators. Clean gas was piped into each of the ears for the purpose of maintaining a pressure designed to keep as much of the coke gas out of the ears as practical in order to minimize the coating of the ears and the insulators with coal tar and carbon. Carbon deposits build up in the ears and they were regularly cleaned by the motor inspectors. This cleaning process involved opening a small door accessible from the walkway, chipping the deposits loose, and then cleaning with rags saturated with highly inflammable light oil. On occasion the insulators would break and they were removed and replaced through the small door.

On the day of the accident Jones and Phillips, both experienced motor inspectors, undertook to clean the ears of precipitator No. 2. At about 8 o'clock in the morning Jones informed Bobby Walker, the by-products operator, of his intention. It was the duty of the by-products operator to have the inlet and outlet valves on the coke gas lines closed, to close the clean gas line, and to turn on the steam to purge all gas from the precipitator to be cleaned. The electricity had already been turned off by the motor inspectors. About 9 or 9:30 Phillips and Jones notified Walker to turn off the steam and then checked the ears, finding the insulator in the west ear broken and both ears dirty. They noticed the odor of gas and reported the fact to Walker, who turned the steam back on and ordered laborers to check the valves.

They then went to the work shop for their tools and Jones reported the broken insulator to McWhirter and told him they had smelled gas and had asked for a re-steaming. McWhirter took no action on the report other than ordering a new insulator. They returned to the precipitator and spent an hour and ten or fifteen minutes scraping the carbon from the interior of the east ear and cleaning the insulator with the light oil. The carbon scrapings, damp from the steaming, were placed in an open bucket. When the work on the east ear was finished, they closed the door, took all of their equipment from the walkway and disposed of the carbon scrapings. They then went to lunch without requesting that the precipitator be steamed.

The motor inspectors returned to work at 1 o'clock and waited ten or fifteen minutes for the new insulator. When it arrived they spent fifteen or twenty minutes cleaning the west ear before they began installing the new insulator. The insulator weighed fifty or sixty pounds and some difficulty was always experienced in inserting it through the small door. Phillips was on his knees holding the insulator inside the door and Jones was standing behind him guiding it into position when the explosion happened. Jones and Phillips were both burned and jumped or fell from the walkway to the ground. Another employee, who had come out onto the walkway, was also burned. Phillips survived his injuries and testified at the trial.

Appellant contends that there was no evidence to support the findings of gross negligence or the issues on proximate cause pertaining to gross negligence. Appellant also contends that all of such findings were so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

The jury found that the accident in question resulted from an explosion of gas in precipitator No. 2 and that Jones died as a result of the explosion. They found that Robert McWhirter, J. Bryan Lawson, Elmer Cooley, J. T. Holt, and Charles Fox were managerial employees of appellant. The term "managerial employees" was defined as employees of a corporation who have charge of the business of the corporation or of the particular department or departments of the business involved in the accident in question. Appellant has no point in his brief attacking these findings.

The jury also found that the following acts were "gross negligence" and proximate causes:

(1) That the valves of Precipitator No. 2 were clogged with tar (Special Issue No. 4) in sufficient amounts to render said valves defective in the use to which they were being put (Special Issue No. 5);

(2) That McWhirter knew the valves were in such defective condition (Special Issue No. 6) and he maintained the valves in that condition (Special Issue No. 7);

(3) That J. Bryan Lawson knew of the defective condition of the valves (Special Issue No. 11) and maintained the valves in that condition (Special Issue No. 12);

(4) That appellant failed to provide adequate valves for preventing gas from entering Precipitator No. 2 while work was being performed thereon (Special Issue No. 16) and that Elmer Cooley (Special Issue No. 18) and J. T. Holt (Special Issue No. 20) and Charles Fox knew of such inadequacy (Special Issue No. 22);

(5) That there were inadequate venting facilities on Precipitator No. 2 (Special Issue No. 25) and that J. T. Holt knew of such inadequacies (Special Issue No. 26);

(6) That the insulators on Precipitator No. 2 were so located as to subject repairing motor inspectors to an unreasonable risk (Special Issue No. 29) and that this fact was known to Elmer Cooley (Special Issue No. 30).

Contributory negligence issues, "Assumption of risk" issues, "fellow servant" issues and an unavoidable accident issue, were submitted to the jury and were answered adversely to appellant.

█ It is no longer necessary to cite authority for the proposition that an appellate court when considering a "no evidence" point must consider only the testimony which supports the verdict of the jury. In making the following statement of facts we bear this rule in mind. The coke gas contained coal tar which was a soft, sticky substance. This gas was propelled by a blower system through 24 inch pipes to the precipitators. Tongue-and-groove type valves were installed which were used to prevent the entry of gas into a precipitator while it was being cleaned. When precipitator No. 2 was first installed, the valves were easy to close, but they had become very difficult to close long before the explosion. No objection was made to testimony that the difficulty in closing the valves was caused by tar in the grooves. When a complaint of gas odors was made, the valves were checked and resteaming was ordered, but the odor of gas was always present in the precipitators and in the by-products area generally. There was no direct evidence that any of the managerial employees knew that the valves were defective *because of tar* or that the presence of tar in the valves was specifically brought to their attention. There was testimony that when the valves became hard to close they were cleaned. Jones complained to McWhirter at safety meetings that the valves on the precipitators were "leaky." The fact that gas and the odor of gas were present in the precipitators after the valves were closed and steaming completed was reported to various employees of the company. Phillips had reported smelling gas in the precipitator to McWhirter eight months to a year prior to the explosion and to Cooley six weeks to three months before that accident and had suggested to him that a different type valve might be better. Gas masks were provided for use of the motor inspectors because some developed nausea and headaches after working in the precipitators.

On the morning before the explosion Phillips called Walker over and *showed* him gas leaking out of the door of the precipitator. Walker checked the valves and told Phillips and Jones that they were closed and, at their request, resteamed the precipitator, but the odor of gas was present when they began work. When the door to the west ear was opened after lunch the

odor of gas appeared to be about the same as in the morning.

In Missouri Pacific Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408, the court said:

"Gross negligence, to be the ground for exemplary damages, should be that *entire want of care* which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it."

█ The court, in Texas Pacific Coal & Oil Co. v. Robertson, 125 Tex. 4, 79 S.W. 2d 830, 98 A.L.R. 262, pointed out that mere indifference is not enough to warrant recovery of exemplary damages. There must be conscious indifference *to the rights or welfare* of the person or persons who may be affected *by the act or omission.*

In Bennett v. Howard, 141 Tex.Sup. 101, 170 S.W.2d 709, the Court said:

"In order for respondents to recover exemplary damages in this case, it was necessary for them to show affirmatively that the petitioners, acting through their superintendent, Smith, disclosed an 'entire want of care' *or* a 'conscious indifference' to the rights of those working under Smith at the time of the explosion."

Appellant knew that after the valves were closed and the precipitators had been steamed gas and the odor of gas usually remained in the ears and that the valves were leaky. Appellant knew that the carbon deposits in the ears would smoulder and become red hot when exposed to air. It knew that the door to the ear remained open during the cleaning process. Appellant had engineers and chemists in its employ and the jury might well have reasoned that it knew the explosive qualities of the gas under such conditions from the circumstance that "no smoking" signs were posted in the by-products area and that the motor inspectors, while they had received no specific directions or warning concerning the danger of explosion, were trained to keep the doors to the precipitators closed at all times they were not required to be open by work in progress. There was also evidence that "burning and welding" took place in the area; such operations were carried out under "strenuous precautions," and that those conducting such operations were "very particular" and were "very careful" with an open flame in the by-products area. A further circumstance for consideration by the jury was the fact that steam was customarily applied to the precipitators at all times while a precipitator was "off the line" unless work was in progress. There was evidence that it was the responsibility of the by-products operator to supervise such safety precautions as were made other than turning off the electricity, but there was no evidence that the company had issued any specific rules or regulations designed to minimize the danger of explosion in this operation, except with reference to keeping the precipitator's doors closed.

The steam was turned off the precipitators when the work began in the morning and was not reapplied at the lunch hour. The jury might well have reasoned that the by-products operator neglected his duty in this respect since a permissible inference from the evidence is that the motor inspectors had a regular lunch hour which would or should have been known to the by-products operator.

There was evidence from which the jury could have concluded that the motor inspectors were lulled into a false sense of security because on previous occasions, when an odor remained after every effort had been made to tighten the valves, managerial employees stated that the odor resulted from steaming the tar in the precipitators.

John Melton, a millwright, testified that all gate valves leak after they have been on gas awhile, and that the carbon deposits will start burning with a visible flame "shortly" if left exposed to the air. Elmer Cooley, the by-products foreman, testified

that on the day of the explosion "a pretty good" wind was blowing from the south into the "mouth" of the precipitator or ear. He further testified that if air got "mixed up" with the accumulation of carbon in the ear, "you might get a spark," and that if the ear is blanketed with the carbon deposits and air is admitted, there is a potential blanket of fire in the ear and if, under such conditions, gas is also present there would be a dangerous situation which should not be permitted.

■ A conclusion that working conditions in the precipitators was dangerous is inescapable. The factors responsible for the danger were known to managerial employees and the danger of an explosion was recognized by appellant. The conditions which combined to cause the explosion had existed for a period of years. Appellant could have foreseen that it was reasonably probable that an explosion would eventually occur unless positive measures were taken to prevent the entry of gas into the ears while they were being cleaned, or else positive measures were taken to prevent the ignition of the carbon deposits. The issues on proximate cause were properly supported by competent evidence, and are not contrary to the weight and preponderance of the evidence.

■ While it might be argued that appellant was not guilty of an entire want of care in that the carbon deposits were dampened by steam before the cleaning process began, there was evidence that this procedure was primarily for the purpose of purging gas from the machine. There was no evidence that the procedure was directed by appellant, nor was there evidence as to the length of time required for the deposit to dry out. No rules were in effect requiring resteaming at such regular intervals as would be necessary to prevent ignition of the deposits. There was evidence to support a conclusion of the jury that appellant was consciously indifferent to the welfare of those assigned the task of cleaning the precipitators, and of other employees who

might be in that area. A conclusion of entire want of care might properly be drawn from the fact that while the general conditions which might support an explosion and fire were known to appellant in the event a sufficient quantity of gas was permitted to accumulate in the precipitator being cleaned, no investigation or precautions against an explosion were taken on this occasion when it was reported that gas was leaking into the ear. Proof of "entire want of care" warrants an inference of "conscious indifference" to the rights, safety and welfare of others, but such "conscious indifference" may appear from the evidence without proof of *entire* want of care. Fancher v. Cadwell, 159 Tex.Sup. 8, 314 S.W.2d 820; Bernal v. Seitt, 158 Tex.Sup. 521, 313 S.W.2d 520; Burt v. Lochausen, 151 Tex.Sup. 289, 249 S.W.2d 194; Bowman v. Puckett, 144 Tex.Sup. 125, 188 S.W.2d 571.

In Morton Salt Co. v. Wells, 123 Tex. Sup. 151, 70 S.W.2d 409, the Court specifically approved this language of the Court of Tex.Civ.App. in the same case (35 S.W. 2d 454):

"Furthermore, the cumulative effect of the findings of the jury is that defendant was guilty of gross negligence in failing to discharge the nondelegable duty imposed by law upon it as master to furnish Wells, its servant, with safe, suitable appliances and instrumentalities for the work in hand. This duty was a continuing one and included that of adequate inspection, therefore defendant was liable for the negligence of one to whom the performance of such duty was entrusted."

The Supreme Court indicated that the facts in the Morton Salt case warranted the finding of "entire want of care" when it said:

"The plain facts are that for years the company provided for the use of its employees a dangerous machine; and although its infirmities increased with use and age, efforts to render it safe, if any were made, were but of the slightest character."

■ The facts in this case seem much stronger in support of a finding of gross negligence than were the facts in the Morton Salt case. While many of the matters of fact recited in this opinion were controverted, the findings of the jury on gross negligence are fully supported by credible evidence and, therefore, are not so contrary to the weight and preponderance of the evidence as to be clearly wrong and unjust.

■ Appellant also urges that the trial court erred in failing to hold as a matter of law that Jones voluntarily assumed the known risk of working on precipitator No. 2. In Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60, the Supreme Court said:

"A plaintiff's right to recover cannot be defeated on the theory that he assumed the risk of injury under the doctrine of volenti non fit injuria unless it appears that with full knowledge of the nature and extent of the danger involved he put himself in the way of a particular risk involved as the result of an intelligent choice."

Appellant has not established as a matter of law that Jones had such a knowledge of the nature and extent of the danger of *explosion* and *fire* by reason of the presence of coke gas in the ear as to fully appreciate the risks involved in his work. He cannot be held as a matter of law to have voluntarily assumed such risks. Peck v. Peck, 99 Tex. 10, 87 S.W. 248; McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S.W.2d 391.

■ Appellant asserts also that contributory negligence was established as a matter of law and several possible acts of negligence on the part of Jones are suggested. While there is evidence of such negligence, we are unable to agree that it is established as a matter of law.

■ The brief of Amicus Curiae suggests that the cause of the explosion was unexplained and that, therefore, there was no conscious indifference to a foreseeable cause of the event. The only reasonable explanation of the explosion developed by the evidence was that discussed previously in this opinion. It was suggested that the explosion might have been caused by the ignition of the light cleaning oil caused by a cigarette or the burning of carbon scrapings removed from the ear. However there was direct testimony by Phillips that the first explosion came from within the ear and that the bucket in which carbon scrapings were deposited was on the opposite side of the platform from the bucket of oil. He also testified that no one was smoking on the platform. Two witnesses saw coke gas flowing from the door of the ear when it was first opened. The clean gas line had been disconnected and the ear steamed before the work began on the west ear. There was testimony that all of the valves were defective and leaked gas. Accepting the testimony that the steaming procedure eliminated the gas present in the precipitator before work began, the only reasonable explanation for the presence of gas in the west ear at the time of the explosion is that the valves continued to leak gas during the work day. The combination of direct and circumstantial evidence was sufficient to establish the cause of the explosion.

Appellant contends that the trial court erred in informing the jury of the legal effect of its findings to the special issues and in permitting counsel for appellees to so inform the jury during voir dire examination and closing argument.

In their Fourth Amended Original Petition appellees alleged:

"Your Plaintiffs have sustained actual legal damages in the amount of thirty five dollars ($35.00) per week for six and $^{12}\!/\!_{13}$ ($6^{12}\!/\!_{13}$) years. This suit is maintained because of gross negligence on the part of your defendants, and as a result thereof your plaintiffs are entitled to recover exemplary damages, and here now sue for the sum of two hundred fifty thousand dollars

($250,000.00) exemplary damages, which bears a reasonable relationship to the actual damages they have suffered."

Appellant alleged in its Answer and proved out of the hearing of the jury that appellant was a subscriber to the Workmen's Compensation Act, and that appellees had been awarded workmen's compensation benefits, which award had been accepted by appellant's insurer. Appellant presented a motion in limine to the trial court requesting that counsel for appellees be instructed " . . . not to mention, either directly or indirectly, or to refer to, or in any manner intimate to the jury the effect of their answers to the special issues regarding actual damages and that such actual damages are not recoverable by plaintiffs . . ." This motion was sustained by the trial court, who instructed counsel not to mention the matters contained in the motion in limine in the presence of the jury, or on voir dire examination of the jury, without first taking the matter up with the court out of the presence of the jury.

Thereafter one of appellees' counsel on voir dire examination stated to the jury panel:

"Now, ladies and gentlemen, Walter O. Jones, at the time of his death, was about thirty eight years of age, and there will be proof on what he was earning. My recollection is that he made about seven thousand ($7,000.00) dollars or so a year, and he contributed to the total support of his wife and four children, contributed to their support and was of benefit to them in advising them and taking care of them other than by just furnishing them a living.

"And it is our position that those damages have been swept away from these plaintiffs as a result of the gross negligence acts of the defendants; *but, we are bringing this suit to recover exemplary damages in the amount of two hundred fifty thousand dollars.* You will be asked to find the award, you will be asked to find the amount of exemplary damages to which these plaintiffs are entitled for which we sued, and we will urge you to bring in an award of two hundred fifty thousand dollars.

"Neither Mr. Brown nor I were raised in any manner other than to know that is a lot of money. *We say we have a lot of damages here.*

"You will also be asked to find what the actual damages were that have been suffered by Mrs. Jones and her children. *We are suing for the exemplary damages* in the amount of two hundred and fifty thousand dollars."

No specific objection was made to this statement.

Appellant's attorney in his voir dire examination stated: "It has already been indicated by the plaintiffs' attorney, Mr. Watkins, the plaintiffs are seeking damages of both actual damages and exemplary damages." At this point he was interrupted by Mr. Watkins, who stated: "We object, we didn't indicate we are seeking to recover actual damages. * * *. We told the jury we are asking for exemplary damages." At which point the court instructed the jury panel as follows:

"The plaintiffs in this case are seeking to recover exemplary damages for the wife and children of the deceased. There will be evidence as to the actual damages and you will be called upon in all reasonable probability to determine what the actual damages were, but the plaintiff is not seeking to recover actual damages."

Appellant, thereupon, moved for a mistrial on the grounds that counsel for plaintiffs had repeatedly informed the jury that plaintiffs were suing only for exemplary damages and are not interested in and will not receive the actual damage award to be sought by plaintiffs from the jury in

response to the special issues submitted to it by the court, and that such conduct, as well as the instruction to the panel by the court informed the jury of the effect of their answers to the special issues submitted to the jury on actual damages, contrary to law, and that the errors cannot be cured by any instruction of the court. This motion was overruled by the court.

Thereafter, during the argument to the jury the counsel for the plaintiffs made it plain to the jury that they were suing for exemplary damages and did not particularly care what the answer to the actual damage issue was. In his argument counsel for plaintiffs stated that the first year when Jones went to work for Sheffield he made thirty six hundred and twenty dollars and at the time of his death he was making eight hundred and twenty dollars a month. Then followed the plea:

"So, what would be fair and reasonable under those circumstances to award? We say it should be the full two hundred and fifty thousand Dollars that we sued for, * * *. On this other damage issue, whatever number it was, on that Mr. Brown suggested 80. You can make it less than that as far as I am concerned. You will probably want to write 80, or maybe more, I don't particularly care. I want to say this, though, don't subtract one single penny of that other damage issue from the exemplary issue, on which we sued * * *."

No objection was made to this argument, it being the contention of appellant that in view of the instruction given to the jury panel by the court, an objection would have been futile and would have further emphasized appellees' position.

Section 26 of Article 16, Vernon's Texas Constitution, provides:

"Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide."

Section 5 of Article 8306, Vernon's Annotated Texas Statutes, provides:

"Nothing in this law shall be taken or held to prohibit the recovery of exemplary damages by the surviving husband, wife, heirs of his or her body, or such of them as there may be of any deceased employé whose death is occasioned by homicide from the wilful act or omission or gross negligence of any person, firm or corporation from the employer of such employé at the time of the injury causing the death of the latter. In any suit so brought for exemplary damages the trial shall be de novo, and no presumption shall exist that any award, ruling or finding of the Industrial Accident Board was correct. In any such suit, such award, ruling or finding shall neither be pleaded nor offered in evidence."

This provision was inserted in the Compensation Act to remove doubt as to rights of beneficiaries of the act to exemplary damages for gross negligence causing employee's death under the quoted Constitutional provision. Morton Salt Co. v. Wells, Tex.Civ.App., 35 S.W.2d 454.

An employee's common law right of action against his employer for exemplary damages sounding in gross negligence was abrogated by the Workmen's Compensation Act in all cases where the Compensation Act is applicable. Jones v. Jeffreys, Tex.Civ.App., 244 S.W.2d 924, error ref.

In King v. Keystone-Fleming Transport, Tex.Civ.App., 299 S.W.2d 747, the court said:

"We think it is so well established as the law in Texas that no recovery of exemplary damages can be had unless

the plaintiff sustained actual loss or injury that no citations of authorities are necessary. The above statute has reference to a plaintiff pleading and offering proof of an award ruling or finding to establish actual loss or injury and in that manner relieving the plaintiff of showing actual loss or injury. Where one has recovered for injury or death under the Workmen's Compensation Act that fact cannot be pleaded or offered in evidence to establish actual loss or injury but in a suit for exemplary damages the trial shall be de novo and the plaintiff must plead and prove actual loss or injury before he can recover actual damages.

"Where the defendant is protected under the Workmen's Compensation Act from actual loss or injury, the plaintiff cannot again recover for the actual loss or injury in his suit for exemplary damages; but may recover exemplary damages. Unless the defendant be permitted to show in some manner that he should not be compelled to pay for the actual loss or injury he would be compelled to pay the judgment for the actual loss or injury although he was protected under the Workmen's Compensation Act, and the plaintiff would be in the position of collecting twice for the actual loss or injury. We think the proper way of showing the plaintiff had recovered or was entitled to recover, if he was injured, under the Workmen's Compensation Act, and that the defendant was not liable for actual loss or injury because he was covered under the Workmen's Compensation Act is by pleading such fact and proving thereof to the court out of the hearing of the jury as was done in this case. We overrule appellants' first point of error. It is stated in the case of Fort Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397, at page 409, as follows:

"'* * * The rule in Texas is that exemplary damages cannot be recovered unless the plaintiff is shown to have sustained actual loss or injury. There can be no recovery of exemplary damages in the absence of a recovery of actual damage. A verdict of *nominal* actual damages is not sufficient. 13 Texas Jurisprudence, pp. 240, 241, § 132, and cases cited in the notes. In this case actual damages are not recoverable because the plaintiff in error carried workmen's compensation insurance. However, we do not believe that the compensation act changes the rule. We are of the opinion that in order to recover exemplary damages the plaintiff must show himself *entitled* to recover actual damages, and which he would recover but for the compensation act. Moreover, the rule in this state is that the amount of exemplary damages allowed must be reasonably proportioned to the actual damages found. 13 Texas Jurisprudence, p. 248, para. 138, and cases cited in the notes. It follows from the rules stated above that in this case the jury should have been asked to find whether or not the defendants in error sustained actual damages by reason of the death of Russell, and, if so, the amount thereof.' "

 We are of the opinion that cases such as this should be tried in all respects as are other cases for actual and exemplary damages, except that the defendant should be permitted to plead and prove his defense under the Workmen's Compensation Act. Neither such pleadings nor the proof produced to support them should be made known to the jury by innuendo or otherwise. Exemplary damages are authorized in proper cases as punishment for a wrongdoer and they cannot properly be awarded as additional compensatory damages. It appears that appellees have successfully persuaded the jury by their pleadings, voir dire examination, and jury argument, as well as by the evidence introduced in the case, to award them compensatory damages in the guise of exemplary damages. We couldn't, however, condemn the

award on that ground alone since in every case the amount of exemplary damages allowed must bear a reasonable relationship to the amount of actual damages sustained.

■ The trial court instructed the jury panel that the plaintiffs were not seeking to recover actual damages. The plaintiffs were seeking a *jury finding* as to the amount of actual damages sustained by the plaintiffs just as they were seeking a finding as to the amount of exemplary damages that should be assessed against appellant as punishment. The effect of these answers was a matter of concern for the court, not the jury. The jury is not concerned with the *particular judgment* desired by the plaintiff. The suit necessarily was for both actual and exemplary damages. While the lawyers and the court knew that, under the undisputed facts as to the payment of Workmen's Compensation, the law would not permit recovery of actual damages, this knowledge did not change the nature of the suit. The rights of plaintiffs in suits arising under the Constitutional provision involved here should be determined under the same rules of procedure whether the amount of actual damages they receive be determined by rules of common law or by the terms of the Workmen's Compensation Act. The legislative intent in that respect is shown by that part of Article 8306, Sec. 5, providing that the trial of a suit for exemplary damages authorized by the Act should be de novo and forbidding in such a suit pleading or offering in evidence any award, ruling or finding of the Industrial Accident Board.

The jury might well have concluded from the pleading of appellees and the remarks of counsel for appellees on voir dire examination of the jury panel that they were not greatly concerned about the amount of actual damages found by the jury. However we cannot say that men of ordinary intelligence without special training in law would be presumed to know the effect of their answers to the special issues submitted in this case. In Ex parte Fisher, 146 Tex. 328, 206 S.W.2d 1000, aff'd Fisher v. Pace, 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569, the Supreme Court said:

"It is obvious that the relator was attempting to inform, and did inform, the jury what the law is with reference to the rights of his client, which was calculated to inform them of the legal effect and result of their answers to the issues submitted. That such conduct and practice is to be condemned under our law of submitting cases upon special issues cannot be doubted, unless unlike the circumstances in the court below, the issues are such that men of ordinary intelligence would be presumed to know the legal effect of their answers."

■ This Court has previously held that it is error and an abuse of the trial court's discretion for the court to permit counsel to advise the jury of the legal consequences of any of the jury's findings. Sisk v. Glens Falls Indemnity Company, Tex.Civ.App., 310 S.W.2d 118, 66 A.L.R.2d 1, writ ref., n. r. e.; Robinson v. Lovell, Tex.Civ.App., 238 S.W.2d 294, writ ref., n. r. e. It is likewise error for the trial court to so advise the jury directly. While the procedure may be artificial, the law, under the circumstances of this case, requires that the plaintiff seek actual damages *by his suit,* and the jury may not be instructed to the contrary.

■ Appellant has also complained that the answer returned by the jury to the issue submitted on actual damages was not supported by the pleadings. There was pleading of actual damage amounting to $12,600.00. While the jury answered the issue in a greater amount, since no actual damages were awarded by the judgment, the error would not require reversal.

■ The answer becomes important, however, in determining whether or not the amount of exemplary damages bears a reasonable relationship to the actual damages found by the jury. Awards under the

Workmen's Compensation Act have no necessary relationship to the amount of actual damage sustained. If an exception had been urged to the petition no doubt it would have been sustained by the trial court for the reason that the pleading was calculated to inform the jury that workmen's compensation insurance was, in some manner, involved in the suit. Since by their pleadings appellees had sought actual damages in the sum of $12,600.00, counsel were in error in asking the jury to find that actual damages in the sum of $80,000.00 had been sustained. The trial court has ample authority to prevent such erroneous argument even though no objection is made. Rule 269(g), T.R.C.P. In any event it is the opinion of this Court that in the event the jury finds actual damages in a sum in excess of the amount stated in the pleadings, the amount of the exemplary damages awarded by the judgment of the court must bear a reasonable relationship to the amount of actual damage as limited by the pleading.

We have carefully considered appellant's Points Nos. 10 and 11 and find that they do not present error.

■■■ Appellees have presented a counter-point to the effect that the trial court erred in rendering judgment notwithstanding the verdict in favor of Robert McWhirter. McWhirter was a line foreman in the maintenance department. He was found guilty of gross negligence in maintaining the inlet and outlet valves in a defective condition caused by tar deposits. McWhirter is not charged with the knowledge possessed by other employees of appellant. There is evidence from which the jury could have concluded that McWhirter knew that the valves had not operated properly on many occasions in the past and that gas was present in the precipitator on the morning of the accident after the precipitator had been steamed the first time and that he took no action. Maintaining the valves in a defective condition might well be negligence, but, in the absence of proof of his knowledge of the other conditions and circumstances which, together with leaking gas, created an extremely dangerous situation which in reasonable probability would result in serious injury to the workers under his supervision, it would not be gross negligence under the facts of this case. The court properly rendered judgment non obstante veredicto for McWhirter.

The judgment of the trial court is reversed and remanded.