726 F.2d 207
 Betty Lou MARTIN, Individually and as Next Friend of
Kimberly Rene Martin, Graylin Keith Martin and
Damon Lyndell Martin, Minors, and Terry
Wayne Martin, Plaintiffs-Appellees,
v.
TEXACO, INC., Defendant-Appellant.
 No. 82-2403.
 United States Court of Appeals,
Fifth Circuit.
 March 5, 1984.
 
 Orgain, Bell & Tucker, Lawrence Louis Germer, Mark T. Beaman, Beaumont, Tex., for defendant-appellant.
 Provost, Umphrey, Doyle & McPherson, Stephen M. Rienstra, Port Arthur, Tex., for plaintiffs-appellees.
 Appeal from the United States District Court for the Eastern District of Texas.
 Before BROWN, THORNBERRY and TATE, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 Clarence J. Martin, Jr. died in a work-related accident at a Texaco refinery in Port Arthur, Texas. His widow, Betty Martin, and heirs, brought this diversity suit against Texaco Inc. for gross negligence, and a jury awarded plaintiffs one million dollars in exemplary damages. Texaco appeals from that judgment, claiming that the evidence was insufficient to support a jury finding of gross negligence, and that the court erred in various instructions to the jury. We find no reversible error and therefore affirm the judgment of the district court.
 
 
 2
 Clarence Martin was working as a brick mason at Texaco's Port Arthur refinery on July 6, 1978. Martin and a co-worker, Terry Chapman, were involved in a routine "testing and inspection" procedure that involves shutting down a unit of the refinery for repairs and maintenance. Martin was to work inside a surge drum, which is an enclosed vessel about twenty feet long and ten feet high. Chapman was to be the "holewatcher," remaining just outside a small manway leading into the drum to hand Martin tools and to keep a constant watch on him, as required by Texaco's safety procedures.
 
 
 3
 The two men decided to hook up an air ring blower, a device used to cool closed vessels on hot days by blowing piped air into the vessel. Located near the vessel was a Chicago coupling with a red hose. A Chicago coupling is a hookup that taps into a pipeline, with color coded hoses that can be connected to other lines. A red hose indicated that the pipeline to which the coupling was attached contained either air or water. Chapman hooked the air ring blower hose to the Chicago coupling, and Martin, who was at the other end of the hose, tested the blower, presumably to see if the pipeline contained air. Something that the men believed to be air blew out, so the air ring blower was placed inside the vessel. What the two men thought to be air, however, was nitrogen. An unknown employee had placed the Chicago coupling on an unmarked pipeline in violation of Texaco's safety procedures. Chicago couplings with red hoses were to be attached only to lines marked air or water.
 
 
 4
 Nitrogen is odorless, and the men were unable to distinguish it from air. Although a relatively harmless gas,[1] nitrogen will displace oxygen if fed into an enclosed area. Nitrogen, therefore, presents a peculiar danger: it is not easily detected, and, if fed into an enclosed area, it will cause suffocation once it has displaced the oxygen. Such displacement occurred inside the vessel as Martin was working, and he soon lost consciousness.
 
 
 5
 Chapman noticed that Martin was slumped over inside the drum, and climbed inside to assist him. Chapman himself subsequently lost consciousness, but he managed to call for help before passing out. Attempts to rescue Martin and Chapman resulted in three to four other men entering the drum and losing consciousness. Unable to detect the presence of a harmful gas, these men could not determine the nature of the problem. The ordinary filter-type gas masks used by some of the rescuers were ineffective because there was no oxygen in the drum. Finally, someone thought to blow air into the drum, and only then could rescuers pull the men out. Although the other men recovered, Martin could not be revived. His widow and children brought this suit, claiming that Texaco's gross negligence was the cause of his death.[2]
 
 I. Jury Finding of Gross Negligence
 
 6
 Texaco argues that the record does not contain sufficient evidence to support a jury finding of gross negligence. The Texas Supreme Court has defined gross negligence as "an entire want of care which would raise the belief that the act or omission complained of was a result of a conscious indifference to the right or welfare of the person or persons to be affected by it." Missouri Pacific Ry. v. Shuford, 72 Tex. 165, 171, 10 S.W. 408, 411 (1888). This long-standing definition was again announced as the proper standard in Burk Royalty Company v. Walls, 616 S.W.2d 911 (Tex.1981). The court in Burk Royalty explained that under this definition, the inquiry is not to determine whether there was an entire want of care, but rather to decide if defendant's act or omission was such that it raised an inference of conscious indifference. "What lifts ordinary negligence into gross negligence is the mental attitude of the defendant.... In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care." 616 S.W.2d at 922 (emphasis in original). See Maxey v. Freightliner Corporation, 665 F.2d 1367 (5th Cir.1982). Under this standard, then, plaintiffs in this case had to show that Texaco was aware that the presence of nitrogen in the refinery created a peculiar hazard. They also had to present evidence of acts or omissions of Texaco from which one could infer indifference toward employee safety in view of this particular danger.
 
 
 7
 In reviewing the sufficiency of evidence, this court applies the test set forth in Boeing Company v. Shipman, 411 F.2d 365 (5th Cir.1969) (en banc). The court considers all of the evidence, drawing all reasonable inferences most favorable to the party opposing the motion for directed verdict or judgment n.o.v. If the evidence is of such quality and weight that reasonable persons might reach different conclusions, the case should be decided by a jury.
 
 
 8
 There was considerable evidence in this case relating to the mental attitude of the defendant. In gross negligence cases, "all circumstances indicating a state of mind amounting to conscious indifference should be examined to determine if there is some evidence of gross negligence." Poole v. Missouri Pacific Railroad Company, 638 S.W.2d 10, 12 (Tex.App.--Houston 1982, writ ref'd n.r.e.) (citing Burk Royalty). Both plaintiffs and defendant introduced evidence relating to Texaco's general safety procedures and policies. In view of all of Texaco's various safety procedures, it would be difficult to say that, generally, Texaco did not care about safety. The inquiry in this case, however, does not involve an evaluation of Texaco's overall conduct. It focuses instead upon the particular hazard that caused Martin's death. The question is not whether Texaco's general safety program reflected an attitude of conscious indifference. The relevant inquiry is whether Texaco was consciously indifferent as to the dangers presented by the use of nitrogen in the refinery.
 
 
 9
 At the time of the accident, Texaco recently had begun using nitrogen to purge refinery vessels. Until two months before the accident, the company had used flue gas rather than nitrogen for that purpose. The pipelines which had previously carried flue gas began to carry nitrogen instead; nitrogen had not been present in pipelines in that area of the refinery before the changeover. The flue gas used previously had a distinctive odor, and any worker inadvertently tapping into a pipeline with flue gas would immediately realize the mistake.
 
 
 10
 A previous accident brought the peculiar hazard of nitrogen to the attention of Texaco management. In March 1976, a worker sandblasting in a different area of the refinery hooked into a line that was supposed to contain air. The line had been changed from air to nitrogen, but the line was still labeled "air." Unaware that nitrogen was being fed into his blasting hood rather than air, the worker wore the hood and quickly lost consciousness. He was revived after his hood was removed.
 
 
 11
 Texaco supervisory personnel investigated that accident and sent a report to the plant manager. The report noted that the unsafe act that caused the accident was the failure to warn employees of the changeover from air to nitrogen. The report included safety recommendations designed to prevent that type of accident, but the suggestions were limited to that specific area of the refinery.
 
 
 12
 This previous incident shows that the refinery's management, including the plant manager, knew that nitrogen could easily be mistaken for air. It also shows that management realized that a failure to warn employees of the properties of nitrogen could lead to this type of accident.
 
 
 13
 When nitrogen was subsequently introduced for the first time in the area of the refinery in which Martin was working, Texaco did nothing to warn employees of its potential dangers. The evidence indicated that many of the hourly employees were not told of the changeover to nitrogen. Some of the supervisory personnel, although aware of the changeover, did not realize that nitrogen was a potential cause of death if injected into an enclosed area.
 
 
 14
 Texaco management knew that employees should be warned of the dangers presented by the use of nitrogen, yet it took no steps to do so. Such evidence could lead a reasonable jury to infer a mental attitude amounting to conscious indifference.
 
 
 15
 The fact that Texaco had no actual knowledge that a Chicago coupling had been placed on the wrong line does not absolve Texaco of gross negligence. Because nitrogen is so easily mistaken for air, Texaco owed a duty to warn its employees of this hidden peril. Texaco may not have known that an accident would occur in this particular manner. It did know, however, that it was possible for a worker to mistakenly tap into a nitrogen line and think that he was breathing air rather than nitrogen. As stated by the Texas Supreme Court,
 
 
 16
 It has been pointed out repeatedly that for defendant's negligence to be regarded as the proximate cause of the injury, it is not necessary that the exact nature of the injury or the precise manner of its infliction should reasonably have been foreseen. It is sufficient that the defendant should reasonably have anticipated consequences or an injury of the general nature of that which ensued.
 
 
 17
 Port Terminal Railroad Association v. Ross, 155 Tex. 447, 289 S.W.2d 220, 224 (1956); see Southwestern Bell Telephone Company v. Reeves, 578 S.W.2d 795, 800 (Tex.Civ.App.--Houston 1979, writ ref'd n.r.e.).
 
 
 18
 Applying the Boeing standard, we believe that the evidence in this case could lead reasonable persons to differ as to whether Texaco was consciously indifferent to Martin's safety and welfare. The district court therefore did not err in denying Texaco's motions for directed verdict and judgment n.o.v.
 
 
 19
 II. Sole Proximate Cause and Contributory Negligence
 
 
 20
 Texaco contends that the district court erred in refusing to submit instructions to the jury dealing with the defenses of sole proximate cause and contributory negligence. See Fort Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397, 408 (1934). The jury should be instructed on a legal theory only if the evidence can justify such an instruction. Foster v. Ford Motor Company, 621 F.2d 715 (5th Cir.1980); Lyle v. Bentley, 406 F.2d 325 (5th Cir.1969). Because the record contains no evidence to support these legal theories, the trial court properly refused to submit instructions on them.
 
 
 21
 Although the record indicates the possibility of negligence on the part of Martin's fellow workers, there is no evidence that such negligence was the sole proximate cause of the accident. The fact that the Chicago coupling was placed on the wrong line, and the fact that Chapman hooked up to that coupling, were not the only "but for" causes of the accident. Texaco's failure to warn employees of the dangers of nitrogen was also a "but for" cause. It is reasonable to assume that if the employees had been aware of the hazard created by the nitrogen, Martin's death would not have occurred.[3]
 
 
 22
 Texaco also asserts that the district court erred by not submitting instructions on Martin's alleged contributory negligence. The record, however, contains no evidence to support this claim. Texaco bases its argument on the fact that Chapman and Martin hooked into a Chicago coupling that was not tagged "air." Texaco had issued to some of its employees a set of written procedures which included an instruction to use only couplings that were tagged "air." The evidence also indicated, however, that it was common practice in this plant for the workers to rely on a red hose to mean air or water.[4] In addition, there was no evidence that Martin ever received a copy of these particular rules. That material was distributed during a training program for new employees. This program was first established long after Martin began work at Texaco in 1950, and he was never sent through the program. The evidence did show that Martin received a handbook, but the handbook he received clearly stated that red hoses were for air or water, without mentioning the need to find a coupling that was tagged as such. Moreover, had Martin known of a rule requiring workers to use only tagged lines, the evidence still absolves him of any contributory negligence. Chapman testified that he (Chapman) had hooked the air ring blower hose to the Chicago coupling, and that Martin, at the other end of the hose, had no opportunity to see whether the coupling was tagged or not. Because there was no evidence of contributory negligence, the court properly refused to instruct the jury on that issue.
 
 
 23
 Texaco's related argument, that the accident was not caused by a vice principal of Texaco, is without merit. A corporation is liable for exemplary damages where (1) the negligent act was committed by a vice principal; (2) the act was authorized or later ratified by the corporation; or (3) the act was committed by an agent performing a non-delegable duty. See Fort Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397 (1934). It is clear that it was the duty of various vice principals to warn employees of the danger of nitrogen. Moreover, the duty to provide a safe workplace and safe instrumentalities is a non-delegable duty of the corporation. Burk Royalty Company v. Walls, 616 S.W.2d 911 (Tex.1981).
 
 III. Calculating Exemplary Damages
 
 24
 Texaco's next ground for appeal concerns the Court's charge to the jury. Texas law requires that the amount of exemplary damages be reasonably proportioned to the actual damages. Southwestern Investment Company v. Neeley, 452 S.W.2d 705 (Tex.1970). While explaining this rule to the jury, the Court gave examples of ratios of actual damages to exemplary damages that had been approved by the Texas Supreme Court. Texaco argues that because assessment of damages is a jury function, mention of particular ratios that were acceptable under Texas law was error. We hold that, because the effect of the Court's charge was not to suggest to the jury an appropriate damage award in this case, no error was committed.
 
 
 25
 In reviewing a Court's charge to the jury, we must review the charge as a whole. Chemetron Corporation v. Business Funds, Inc., 682 F.2d 1149, 1178 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1254, 75 L.Ed.2d 483 (1983). The jury charge in the present case contained a detailed and accurate description of the factors to be considered in determining an exemplary damage award. The charge stated in relevant part:
 
 
 26
 If you determine that the plaintiffs are entitled to a verdict and after you have determined the amount of actual damages, then you shall consider and determine the amount of punitive damages to be awarded, if any. As I told you earlier, punitive damages you award for gross negligence must bear a reasonable relationship to the actual damages suffered by the plaintiffs, no precise ratio between actual and punitive damages have been established. Instead, the requirement has been that the amount awarded as punitive damages not so greatly exceeds the actual damages as to indicate that the jury has been guided by passion and prejudice rather than reasoning.
 
 
 27
 The appropriate ratio will vary from case to case, depending on such factors as the character of the wrongful conduct, the extent to which the defendant is involved in the conduct and the extent to which that conduct offends a public sense of justice and propriety.
 
 
 28
 A very recent court decision, last week as a matter of fact, listed five relevant factors for reviewing a jury's award of punitive damages, as follows:
 
 
 29
 (1) The nature of the wrong;
 
 
 30
 (2) The character of the conduct involved;
 
 
 31
 (3) The degree of culpability of the wrongdoer;
 
 
 32
 (4) The situation and sensibility of the parties;
 
 
 33
 (5) The extent to which defendant's conduct offends a public sense of justice and propriety.
 
 
 34
 Clearly, ladies and gentlemen, this is not an exact science, but is a concept that is very well dealt with by a jury.
 
 
 35
 Now, for your further guidance, I have a few additional instructions. Historically, in Texas many courts had set the limit of punitive damages at three times the amount of actual damages. More recently, a Texas--the Texas Supreme Court approved a jury award of twenty times the amount of actual damages. Last week, the Federal Appeals Court disapproved an award of punitive damage that equaled sixty-seven times the amount of actual damages and sent it back for redetermination, but did not indicate how much they considered it to be excessive, but instead established these five guidelines that I have given you. An amount less than actual damages could also be appropriate under the facts of a particular case. I can envision an award of nominal damages for punishment in an appropriate case.
 
 
 36
 If you find liability in this case, then the decision is solely yours; consider the five guidelines that I gave you and find exemplary damages that you find appropriate in this case.
 
 
 37
 After the jury retired for deliberations, Texaco objected to the charge, stating,
 
 
 38
 And the defendant would object to the charge of the Court in suggesting that twenty times actual damages had been approved, in particular, since in that case it was a relatively small award, where in this case actual damages could be substantially [sic] and certainly that would be improper measure for a case like this, and we would object to the charge on that basis.[5]
 
 
 39
 Although the judge overruled Texaco's objection, he called the jury back and gave the following additional instructions:
 
 
 40
 THE COURT: Ladies and Gentlemen, in the abundance of precaution, I wanted to clear up what might have been some confusion that I created.
 
 
 41
 You recall, I gave you by way of guidelines what had happened in a number of other cases press-wise, and I mentioned the fact that there had been a Texas Supreme Court case approving twenty times actual damages as an award. What I had intended to tell you at that time, and in addition to that, was the comment that was made justifying that ratio, was that in that particular case, it was a case of very low actual damages with high culpability or high fault, and so I didn't want to leave with you an impression that twenty times is a normal or appropriate ratio in the usual case, but that that was, I think considered to be an unusual situation, but appropriate in that case, and I had simply neglgected [sic] to add the second part of that instruction to you, and I thought it worthwhile to invite you back to tell you that.
 
 
 42
 The jury returned a verdict finding actual damages of $450,000 and punitive damages of $1,000,000, slightly more than twice the amount of actual damages. See Maxey v. Freightliner Corporation, 722 F.2d 1238 (5th Cir.1984) (affirming conditional remittitur of punitive damages to amount equal to three times the compensatory damages).
 
 
 43
 The Court's charge did not amount to an invasion of the jury's province, as argued by Texaco. By describing a full range of acceptable ratios, the Court did not suggest an appropriate ratio or award for this case. It did not influence the jury other than to help ensure that it arrived at an acceptable ratio or award for this case. It did so by giving the jury an accurate account of Texas law, following the guidelines described in Maxey v. Freightliner Corporation, 665 F.2d 1367 (5th Cir.1982).
 
 
 44
 The Court was free to use examples to illustrate its explanation. Illustrations used to clarify an instruction are within the trial court's discretion. Andry v. Farrell Lines, Inc., 478 F.2d 758 (5th Cir.1973). Moreover, the trial court has a duty to give instructions that are meaningful and translated into terms the jury can understand. Marshall v. Isthmian Lines, Inc., 334 F.2d 131 (5th Cir.1964).
 
 
 45
 The cases cited by Texaco as authority for its position are not analogous to the present case. Those cases involved instructions that used past awards in similar cases as guidelines in determining damages.[6] The fact that the previous cases were similar indicates that the jury was not making an independent determination of damages. In the present case, the ratios were not mentioned in order to suggest an appropriate damage award; their purpose was to illustrate the Texas requirement that exemplary damages be proportionate to actual damages. The judge emphasized that the cases were dissimilar to the present case and that the jury was to make its own determination of the appropriate damages.
 
 
 46
 The decision to instruct the jury in this manner was a matter of discretion for the trial judge. See Rohner, Gehrig & Company v. Capital City Bank, 655 F.2d 571, 580 (5th Cir.1981) (trial judge has wide discretion to charge jury in his own style). The instructions did not diminish the jury's independence, and we cannot say the use of specific illustrations was an abuse of discretion.
 
 
 47
 IV. Informing the Jury that Plaintiffs Would Not Receive Actual Damages
 
 
 48
 Plaintiffs were unable to bring suit against Texaco for ordinary negligence and recover actual damages because Texaco is a "subscribing employer" under the Texas Workers' Compensation Act, TEX.REV.CIV.STAT.ANN. art. 8306-8309f (Vernon 1967). Article 8306, section 3a of that Act provides that employees of subscribing employers waive the right to sue for damages for injuries sustained in the course of employment. If an employee wishes to preserve a right of action for injuries, he or she must give notice in writing to the employer at the time of employment.[7]
 
 
 49
 As widow and heirs of an employee, plaintiffs retained under the Act the right to sue the employer for the employee's death if caused by the gross negligence of the employer. TEX.REV.CIV.STAT.ANN. art. 8306 Sec. 5 (Vernon 1967). The Texas Constitution established this particular right of action, TEX. CONST. art. XVI, Sec. 26, and the purpose of article 8306 Sec. 5 was to clarify the fact that the Act had no effect on that constitutional right. See Morton Salt Co. v. Wells, 35 S.W.2d 454, 456-57 (Tex.Civ.App.--Dallas 1930), affirmed, 123 Tex. 151, 70 S.W.2d 409 (1934).
 
 
 50
 Although this suit was for the recovery of exemplary damages for gross negligence, the issue of actual damages had to be addressed because Texas law requires that awards of exemplary damages be reasonably proportionate to the amount of actual damages found. Southwestern Investment Company v. Neeley, 452 S.W.2d 705 (Tex.1970); see part III, supra. Juries are first required to determine actual damages, and then to arrive at a reasonably proportionate exemplary damage award.
 
 
 51
 In the present case, the judge explained to the jury that, although it must determine the amount of actual damages in order to satisfy the proportionality requirement, plaintiffs would not receive the actual damages because Mr. Martin was covered by workers' compensation insurance. The judge also explained that the Workers' Compensation Act precluded the plaintiffs from suing for ordinary negligence.
 
 
 52
 Texaco contends that the trial court committed error by revealing this information to the jury. Texaco bases its argument in part on article 8306 Sec. 5 of the Workers' Compensation Act, which provides:
 
 
 53
 Nothing in this law shall be taken or held to prohibit the recovery of exemplary damages by the surviving husband, wife, heirs of his or her body, or such of them as there may be of any deceased employe whose death is occasioned by homicide from the wilful act or omission or gross negligence of any person, firm or corporation from the employer of such employe at the time of the injury causing the death of the latter. In any suit so brought for exemplary damages the trial shall be de novo, and no presumption shall exist that any award, ruling or finding of the Industrial Accident Board was correct. In any such suit, such award, ruling or finding shall neither be pleaded nor offered in evidence.
 
 
 54
 TEX.REV.CIV.STAT.ANN. art. 8306 Sec. 5 (Vernon 1967) (emphasis added). The statute forbids the parties in an article 8306 Sec. 5 suit to mention any award, ruling or finding by the Industrial Accident Board in the pleadings or evidence. It does not prohibit a judge from telling the jury that workers' compensation was somehow involved. The prohibition is designed to ensure that a suit in gross negligence is a de novo proceeding. It does so by disallowing evidence of previous findings that could affect the outcome of the trial. Sheffield Division Armco Steel Corporation v. Jones, 369 S.W.2d 71, 83 (Tex.Civ.App.--Houston 1963), rev'd on other grounds, 376 S.W.2d 825 (Tex.1964).
 
 
 55
 The Court's instructions in this case did not fall under the Act's specific prohibition, nor were they inconsistent with the purpose of article 8306 Sec. 5. The jury was not made aware that any findings had been made in another forum. It was simply informed that because the Act's provisions applied in this case, plaintiffs would be unable to recover actual damages. The de novo nature of the trial was not affected. The fact that the employer was a subscriber to workers' compensation and plaintiffs were precluded by the statute from suing for ordinary negligence did not suggest that any previous findings had been made.[8]
 
 
 56
 Although the trial court did not violate article 8306 Sec. 5 by mentioning workers' compensation, it did depart from Texas procedure. In Sheffield Division Armco Steel, a Texas court of civil appeals held that it is error for a trial court to tell the jury that plaintiffs in an article 8306 Sec. 5 suit were not seeking to recover actual damages. This holding was based on the Texas procedural rule that a jury cannot be informed of the legal consequences of any of the jury findings. 369 S.W.2d at 83.
 
 
 57
 Although state law governs the substance of the jury instructions, the manner of giving instructions is controlled by federal law. Kroger Company v. Roadrunner Transportation, Inc., 634 F.2d 228, 230 (5th Cir.1981); Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1289 (5th Cir.), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). Unlike the Texas courts, federal courts are free to tell juries the effects of their answers. See Perricone v. Kansas City Southern Railway Company, 704 F.2d 1376, 1378 (5th Cir.1983) (it is proper to inform jury of effect of answers to interrogatories); Porche v. Gulf Mississippi Marine Corporation, 390 F.Supp. 624, 632 (E.D.La., 1975) (jury is entitled to know what effect its decisions will have).[9] Under federal law, it was not error to inform the jury that plaintiffs would not receive actual damages. The record shows that, after considering the matter, the district judge decided that the better approach would be to fully inform the jury rather than to allow it to deliberate under the false assumption that the plaintiffs would receive actual damages. Additional instructions are a matter of discretion for the trial court, and the decision to give these instructions was not an abuse of discretion.[10] See Roberts v. Williams-McWilliams Company, 648 F.2d 255, 265 (5th Cir.1981 (necessity, extent and character of additional instructions is a matter within discretion of trial court).
 
 
 58
 The need to inform the jury of the workers' compensation aspect of the case possibly could have been avoided if the court had chosen to submit this case under a Rule 49(a) special verdict. FED.R.CIV.P.[11] The decision to use a general verdict rather than a special verdict, however, is a matter of discretion. See Miley v. Oppenheimer & Company, 637 F.2d 318, 334 (5th Cir.1981) (quoting 5A Moore's Federal Practice Sec. 49.03(1): "Under [Federal Rule of Procedure] 49(a) the court has complete discretion as to whether a special or general verdict is to be returned. As with other discretionary acts, this should not be reviewable, except, perhaps, for gross abuse, which can rarely be shown."); Wright & Miller, Federal Practice and Procedure, Sec. 2505 (1971). Choosing to employ a general verdict was not an abuse of discretion, and once the choice was made, it was reasonable to inform the jury of the full effect of its answers.
 
 
 59
 Texaco argues that the damage award was in reality a compensatory award in the guise of exemplary damages. We find no merit in this contention. The award was based on a jury finding of gross negligence, and the amount was not inappropriate.[12] The jury was properly instructed with the charge stating that the policy behind punitive damages "is to punish the person for behavior that offends a public sense of justice and propriety and to deter others from similar behavior." See DeLaCruz v. Atchison, Topeka and Santa Fe Railway Company, 405 F.2d 459 (5th Cir.1968), cert. denied, 395 U.S. 908, 89 S.Ct. 1749, 23 L.Ed.2d 221 (1969) (should assume that jurors will follow routine instructions).
 
 V. Conclusion
 
 60
 Texaco introduced nitrogen into its Port Arthur refinery without warning its employees of the hidden danger created by the use of that gas. As a result, Clarence J. Martin, Jr. died of suffocation. We hold that the evidence was sufficient for a jury to find that Texaco was guilty of gross negligence. We also find that the district court did not err in its instructions or charge to the jury. Accordingly, we affirm the district court's judgment.
 
 
 61
 AFFIRMED.
 
 
 
 [1]
 Nitrogen comprises 78% of normal atmospheric air
 
 
 [2]
 Plaintiffs were unable to sue for ordinary negligence because Texaco is a subscriber to Texas workers' compensation insurance. See part IV, infra
 
 
 [3]
 A general knowledge of this danger would have prevented the tragedy at several points. An employee would have been less likely to place a Chicago coupling indicating air or water on an unmarked line. Chapman and Martin would not have automatically assumed that what seemed to be air was actually air. Even had the accident occurred, rescuers would have realized the nature of the problem much sooner and could have pulled Martin out in time by injecting air into the drum or using self-contained air packs instead of filter oxygen masks
 
 
 [4]
 Several witnesses referred to the fact that attaching a Chicago coupling to an unmarked pipeline was a violation of a well-known rule. This rule is not to be confused with a lesser known, or lesser observed rule, that a worker should not use a Chicago coupling for air unless the coupling itself was tagged "air."
 
 
 [5]
 The basis for Texaco's objection as argued on appeal is somewhat different from this statement. Texaco is now arguing that it was error to mention any past awards at all. Because we hold that no error was committed, we need not address the issue of whether Texaco's statement was sufficient to preserve its objection for appeal. See FED.R.CIV.P. 51 (party must state "distinctly the matter to which he objects and the grounds of his objection"); Wright & Miller, Federal Practice and Procedure Sec. 2554 (1971) (party may not change grounds for objection on appeal)
 
 
 [6]
 See, e.g., Gillen v. Phoenix Indemnity Co., 198 F.2d 147, 151 (5th Cir.1952) (determining damages for pain and suffering according to Louisiana law); Dowell, Inc. v. Jowers, 166 F.2d 214 (5th Cir.1948) (judge may not refer to specific sums awarded in similar cases)
 
 
 [7]
 Art. 8306, Sec. 3a states in part:
 An employe of a subscriber shall be held to have waived his right of action at common law or under any statute of this State to recover damages for injuries sustained in the course of his employment if he shall not have given his employer, at the time of his contract of hire, notice in writing that he claimed said right or if the contract of hire was made before the employer became a subscriber, if the employe shall not have given the said notice within five days of notice of such subscription.
 
 
 [8]
 The judge mentioned once that Martin was "covered" by workers' compensation insurance. The statement implies that some kind of compensation was made, but we do not think this statement, in context, indicated that anyone was at fault or destroyed the de novo nature of the trial
 
 
 [9]
 These cases involve special verdict submissions under FED.R.CIV.P. 49(a). The policy of allowing a jury to know the effect of its answers applies with equal force to a general verdict, especially since general verdicts embody this idea
 
 
 [10]
 One reason the judge decided to enlighten the jury may have been the fact that all but one of the jurors had served on juries before. An experienced juror, or anyone with some knowledge of tort law, could have been puzzled by this case. For example, the attorneys probably would not have emphasized the calculation of actual damages. (Texaco states in its brief that, for tactical reasons, it did not challenge the actual damages claimed by plaintiffs.)
 
 
 [11]
 The use of special verdicts has been a controversial issue among federal judges. See Brown, Federal Special Verdicts: The Doubt Eliminator, Tenth Judicial Circuit Conference, 44 F.R.D. 245, 338 (1967); Wright & Miller, Federal Practice and Procedure, Sec. 2505 (1971)
 
 
 [12]
 Texaco also contends that the trial court erred in refusing to grant a remittitur. We disagree. The exemplary damage award in this case is not so large as to indicate that it is the result of passion or prejudice. See Skillern & Sons, Inc. v. Stewart, 379 S.W.2d 687, 692 (Tex.Civ.App.--Fort Worth 1964, writ ref'd n.r.e.)