George PIERCE and Jeff Pierce, Individually and d/b/a Pierce Sales, a Partnership, Plaintiffs-Appellees,

v.

RAMSEY WINCH COMPANY, A Foreign Corp., Defendant-Appellant.

No. 83–1804.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1985.

Tom L. Armstrong, Joe M. Fears, Tulsa, Okl., for defendant-appellant.

Gary Dobbs, Jack Banner, Wichita Falls, Tex., for plaintiffs-appellees.

Before GARZA, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

A jury determined that the defendant-appellant, a winch manufacturer, violated section one of the Sherman Act when, pursuant to a resale price maintenance conspiracy, it terminated a price-cutting distributor. This appeal from the district court's judgment against the manufacturer for treble damages presents questions with respect to (1) the scope of the trial court's duty to instruct the jury on defensive theories raised by the evidence and (2) the quantum of proof required to survive a motion for directed verdict on the issues of antitrust injury and damages. For the reasons set forth below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Ramsey Winch Company (Ramsey) manufactures various types of winches and winch accessories at its plant in Tulsa, Oklahoma. Ramsey does not, however, sell its products directly to winch-consumers. Rather, the company sells its winches to independent distributors who, in turn, sell them to the public.

Ramsey has established a suggested retail price for each of its winch models. Distributors purchase Ramsey winches at a discount, depending on volume, of between forty percent and forty-five percent of the suggested retail price.[1] According to Ramsey, distributors are then free to sell winches to the public at whatever price they choose. Ramsey does, however, require that its distributors maintain certain inventory levels and that they perform service and warranty work, without reimbursement from Ramsey, on *any* Ramsey product brought to them for service.[2]

In September of 1977, Pierce Sales, a partnership owned by George Pierce and his son, Jeff Pierce, applied to Ramsey for authorization to operate a distributorship in Henrietta, Texas. Although a written distributor's agreement was not executed until July 7, 1978, Ramsey began filling Pierce Sales winch orders shortly after the application was received. Pierce Sales, in turn, began to market aggressively Ramsey winches. The company advertised Ramsey products extensively in local and national publications and conducted a direct mail campaign designed to solicit orders from dealers in areas not well-covered by existing distributors. At first, Pierce Sales

---

1. A distributor receives the maximum forty-five percent discount from the suggested retail price on orders of fifty winches or more. Discounts on smaller orders are as follows:

 0– 9 winches—40%
 10–19 winches—41%
 20–29 winches—42%
 30–39 winches—43%
 40–49 winches—44%

2. Ramsey itself is obligated to replace defective parts in winches that are under warranty. Ramsey distributors, however, are required by Ramsey to provide, at their own cost, service associated with removing, repairing and reinstalling defective winches, even winches sold by other distributors. Ramsey then reimburses the distributors for the cost of parts. Record Vol. V at 616. Moreover, the Ramsey distributor agreement obligates distributors to "render prompt and adequate service at reasonable prices to all users of [Ramsey winches] ...

directed its efforts toward the salvage market. Later, at Ramsey's urging, Pierce Sales sought to expand into the four-wheel drive market. Throughout, the thrust of its marketing plan was price competition. Pierce Sales reduced its own costs by (1) making volume purchases of more than fifty winches per order to receive the maximum Ramsey discount from the suggested retail price; (2) paying cash to receive an additional Ramsey discount for cash orders; and (3) picking up its winches at the Ramsey plant, rather than having them shipped to Henrietta, to reduce transportation costs. As a result of these cost-saving measures, Pierce Sales was able to offer Ramsey products at very low prices, a fact that was displayed prominently in its advertisements and mailings. Pierce Sales' marketing plan was very successful; through November of 1978, sales of Ramsey winches, both direct sales at its store in Henrietta and mail order sales to buyers throughout the country, steadily increased. By May, 1978, Pierce Sales, with Ramsey's approval, billed itself as "Texas' largest discount distributor" of Ramsey winches.

It is undisputed that many Ramsey distributors complained to Ramsey that Pierce Sales' prices were too low. Ramsey claims that it also received complaints that Pierce Sales was not providing adequate service and warranty work to Ramsey consumers. The evidence is conflicting on what happened next. Ramsey claims that it took no action based on the price complaints that it received from other distributors about Pierce Sales. Ramsey further claims that, with respect to price, its only concern was that Pierce Sales generate sufficient profit to perform adequately its service obligations. Pierce Sales claims, on the other hand, that Ramsey, acting in concert with its other distributors, attempted to force Pierce Sales to conform to a resale price maintenance policy. At one point, Pierce Sales claims, Ramsey threatened legal action if Pierce Sales persisted in selling winches at low prices. In May of 1978, Ramsey officials met with George and Jeff

Pierce in Henrietta, Texas. Although the details are disputed, Pierce Sales claims that the purpose of the meeting was to force Pierce Sales to raise its prices. Pierce Sales points to an inter-office memorandum, prepared by Ramsey officials, which describes the results of the meeting: "After a 5 hour discussion, [the Pierces] promised to raise prices and would have all adds [sic] approved by Ramsey Winch Co. in the future." Plaintiff's Ex. 9. Ramsey, on the other hand, argues that the purpose of the agreement reached at the meeting was not to fix prices, but to ensure that Pierce Sales made enough profit on winch sales to meet its service and warranty obligations. After the meeting, Pierce Sales raised its prices slightly and took steps to remove mention of its low prices from its advertisements. It also submitted all future ads to Ramsey for approval.

Pierce Sales continued to distribute Ramsey products until late in 1978. At that time, Pierce Sales obtained a list of authorized Ramsey distributors and mailed to each of them a list of Pierce Sales' current inventory of Ramsey products and the price at which that inventory could be purchased. Because Pierce Sales made volume purchases and received the largest available discount from Ramsey's suggested retail price, Pierce Sales was able to offer prices in the mailing that were lower than the prices paid by many small distributors to purchase winches directly from Ramsey. Shortly after Pierce Sales distributed the inventory and price list, Ramsey summoned George and Jeff Pierce to Tulsa for a meeting with company vice-president Joe Henry. The next day, Ramsey terminated Pierce Sales' right to distribute Ramsey winches.

Ramsey claims that it terminated Pierce Sales because (1) Pierce Sales failed to perform adequately its warranty and service obligations and (2) Pierce Sales, through the inventory and price-list mailing, directly solicited orders from other Ramsey distributors which, according to Ramsey, would, if successful, disrupt its entire distribution

regardless of when, where, or by whom sold." · Plaintiff's Ex. 14.

system.[3] Pierce Sales claims, on the other hand, that it mailed its inventory and pricelist to other distributors, with Ramsey's permission, simply to inform them of the winch models that Pierce Sales had in stock. Pierce Sales claims that, around this time, the Ramsey factory was experiencing delays in supplying certain models. The professed goal of the mailing was not to take over Ramsey's distribution system; rather, Pierce Sales simply wanted to inform other distributors of alternative sources of supply for Ramsey products that were not immediately available from the factory. If the others reciprocated, all distributors could speed back-ordered winches to consumers as quickly as possible. Moreover, Pierce Sales claims that Ramsey terminated its distributorship because Pierce Sales' discount prices threatened Ramsey's resale price maintenance scheme, which Ramsey implemented and enforced through concerted action with its other distributors. Pierce Sales responded to termination in two ways: (1) it began to sell winches made by other manufacturers and to increase its marketing efforts with respect to products other than winches and (2) it filed this action for treble damages alleging that Ramsey terminated its distributorship in violation of section one of the Sherman Act.[4]

Pierce Sales' complaint alleges a vertical price-fixing conspiracy between Ramsey and its distributors. The district court submitted the case to the jury on the theory that such a conspiracy, if proven, is per se illegal.[5] The jury found that (1) Ramsey conspired to fix the resale price of winches sold to its distributors; (2) Pierce Sales' distributorship was terminated "as a result" of that conspiracy; and (3) termination proximately caused Pierce Sales $705,238.45 in damages.[6] The district court tre-

3. As noted, a small distributor who purchases only a few winches at a time pays more per winch to Ramsey than a large distributor, like Pierce Sales, who receives the maximum discount from the suggested retail price. If, because of volume buying and other cost-saving measures, Pierce Sales can profitably sell to small distributors at a lower price than that offered by Ramsey, the small distributors obviously have an economic incentive to purchase from Pierce Sales, rather than directly from Ramsey. If distribution occurs in this manner, Ramsey sells the same number of winches; Ramsey makes less money, however, because more winches are sold at the maximum discount. Moreover, Ramsey claims that this system of distribution would allow distributors to evade Ramsey inventory requirements. Ramsey requires that new distributors purchase a minimum amount of inventory; Pierce Sales did not impose a similar requirement. Ramsey claims that it has the right to terminate a distributor who competes directly with the company and attempts to upset its distribution system in this manner.

4. Section one of the Sherman Act provides, in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

It is, of course, section four of the Clayton Act which authorizes the private treble damages remedy:

Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

\* \* \* \* \* \*

15 U.S.C. § 15(a).

5. The Supreme Court has recently reaffirmed that vertical price-fixing conspiracies are per se illegal. *See Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, ——, 104 S.Ct. 1464, 1469 & n. 7, 79 L.Ed.2d 775 (1984).

6. The court submitted the following special interrogatories to the jury:

INTERROGATORY NO. 1

Do you find from a preponderance of the evidence that during the relevant time period Defendant Ramsey Winch Company combined or conspired to fix or artificially maintain or stabilize the price of winches sold by its distributors in violation of Section 1 of the Sherman Act?

Answer "YES" or "NO"

ANSWER: ____Yes____

INTERROGATORY NO. 2

Do you find from a preponderance of the evidence that Plaintiff was terminated as a result of such violation?

bled the jury's award, which is the exact figure calculated by Pierce Sales' expert witness, and entered judgment against Ramsey for $2,115,715.35, plus $36,750 in attorneys' fees. Ramsey appeals.

## II. CONTENTIONS ON APPEAL.[7]

Ramsey argues that the judgment must be reversed because of errors vitiating both the jury's liability finding and its damage award. As to liability, Ramsey argues that the district court's jury instructions on the degree of evidence necessary to support a finding of conspiracy or combination were incomplete. This error, according to Ramsey, allowed the jury to find a price-fixing conspiracy from nothing more than distributor complaints followed by termination. Ramsey also argues that the district court erroneously refused to give a requested instruction explaining Ramsey's defense—that it terminated Pierce Sales to protect its distribution system—to the jury.

As to damages, Ramsey contends that (1) the district court erroneously refused to admit two exhibits summarizing the testimony of Ramsey's damages expert; (2) the court's jury instruction on the duty to mitigate damages was inadequate; and (3) the damage award was influenced by passion and prejudice which, because the court overruled objections to improper argument, Pierce Sales was allowed to instill in the jury. In addition, Ramsey argues that there has been a complete failure of proof on the issues of fact of damage and amount of damage. According to Ramsey, the district court should have granted its respective motions for directed verdict and judgment notwithstanding the verdict because Pierce Sales' damages evidence is entirely speculative. The only evidence on damages, according to Ramsey, was provided by Pierce Sales' expert accountant, who based his calculations on several unfounded assumptions. Pierce Sales' business has in fact flourished since termination and, according to Ramsey, was not injured by the loss of Ramsey products. We will consider each of these arguments in turn.

## III. LIABILITY ISSUES.

### A. *Preserving Error.*

Ramsey complains that the district court refused to submit to the jury two of its proposed instructions on Sherman Act liability. As an initial matter, Pierce Sales argues that Ramsey did not comply with Rule 51, Fed.R.Civ.P.,[8] and that the propriety of the court's instructions has not been preserved for appellate review. We disagree.

 Ramsey submitted twenty requested jury instructions, in writing, for the court's consideration. Ramsey now com-

---

Answer "YES" or "NO"

ANSWER: _____ Yes _____

### INTERROGATORY NO. 3
Do you find from a preponderance of the evidence that such termination by Defendant Ramsey Winch was a proximate cause of injury or damage sustained by Plaintiffs?

Answer "YES" or "NO"

ANSWER: _____ Yes _____

### INTERROGATORY NO. 4
What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Plaintiffs for injury or damages which you have found as proximately caused by conduct on the part of Defendant Ramsey Winch Company in violation of Section 1 of the Sherman Act.
ANSWER IN DOLLARS AND CENTS, IF ANY

ANSWER: _____ 705,238.45 _____

Record Vol. I at 233–36.

7. We reject out of hand the contention by Pierce Sales that, because of formal defects in its brief, Ramsey has failed to present any issues for review. Ramsey's brief clearly presents each of the issues discussed in part II for appellate review. We discuss whether Ramsey preserved those issues by appropriate objection or offer in the trial court later in the opinion.

8. Rule 51 provides, in pertinent part:
 No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.
Fed.R.Civ.P. 51.

plains that the district court's refusal to give instructions no. 4 and no. 7A constitutes reversible error. Pierce Sales correctly points out, however, that, in objecting to the court's failure to give these instructions, Ramsey did not, at the time appointed for objecting to the charge, state the grounds for its objection; Ramsey simply listed by number the proposed instructions that it wished to have submitted to the jury.[9]

Rule 51 clearly sets forth the mechanism for preserving error with respect to rejection of a proffered jury instruction: counsel must, after the charge is read and before the jury begins to deliberate, object and state distinctly the grounds upon which submission of the instruction is urged. "The purpose of the rule is to enable the trial court to correct any error it may have made before the jury begins its deliberations and thus avoid the necessity of a new trial." *Lang v. Texas & P. Ry.*, 624 F.2d 1275, 1279 (5th Cir.1980).

Pierce Sales argues that simply submitting instructions to the court and objecting, without explanation, to the court's failure to give those instructions will not preserve error. We agree that such a procedure, because it is unlikely to draw the court's attention to any errors in the charge that might be corrected before deliberations begin, is generally insufficient to preserve error. In *Haupt v. Atwood Oceanics, Inc.*, 681 F.2d 1058, 1062 (5th Cir.1982), we noted that "a general request to the court to incorporate any ... requested instructions which were not contained in the court's charge ... is insufficient to constitute a

proper objection under the Federal Rules of Civil Procedure."

It is clear, however, that Ramsey made its position known to the district court prior to the time at which the court gave counsel an opportunity to state, on the record, their objections to the charge. Although the charge conference between court and counsel was not transcribed, the record contains, in addition to Ramsey's requested instructions, a memorandum which sets forth Ramsey's position with respect to its requested instructions. Thus, although Ramsey's formal objections to the court's refusal to give its requested instructions are not accompanied by a distinct statement of its grounds, Ramsey, by making its position known to the court prior to stating its formal objections, adequately preserved these issues for review. *See, e.g., Little v. Green*, 428 F.2d 1061, 1069 (5th Cir.) (approving procedure whereby counsel provides court with reasons for its objections prior to the time, prescribed by Rule 51, for formal objections, followed by simple objections, without reasons, at the Rule 51 time), *cert. denied*, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970). *Cf. Lang*, 624 F.2d at 1279 (Rule 51 "is not without exceptions, however, and the failure to object may be disregarded if the party's position has previously been made clear to the court and it is plain that a further objection would have been unavailing.").

B. *Standard of Review.*

▮▮▮▮ The trial court's responsibility with respect to the jury charge is clear: "It is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on

---

**9.** After objecting to several of the instructions that the court did give, Ramsey stated:

Comes now the Defendant and objects to the failure of the Court to give certain instructions. In that connection, Defendant would show the Court that it has previously filed a motion of the Defendant to give requested instructions NOS. 1 through 18. Taking those 18 instructions, Defendant would at this time request the Court to give Instruction NO. 3, Proposed Instruction NO. 3, Proposed Instruction NO. 4, Proposed Instruction NO. 5, Proposed Instruction NO. 7,

\* \* \* \* \* \*

Offer NO. 18. In addition, Your Honor, we have previously furnished the Court and counsel copies of these but we propose to offer at this time, and have offered in Chambers, a motion to give two additional instructions, Instruction NO. 7–A and Instruction NO. 13–A. And we would offer those two instructions at this time.

Record Vol. VI at 790–91.

the applicable law of the case, and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search for the truth." 9 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2556 (1971). Obviously, this duty is not limited to instructions on the law that underlies plaintiff's theory of recovery; a defendant is also entitled to have the jury instructed on the law that supports defensive theories that are raised by the evidence.[10] *See, e.g., Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 302 (5th Cir.1978).

 The parties are not, however, entitled to have the jury instructed in the precise language or form that they suggest. *See, e.g., Delancey v. Motichek Towing Serv.,* 427 F.2d 897, 902 (5th Cir.1970) ("The court is not required to give instructions in the language and form a litigant's lawyer fancies."); *see also Alexander v. Conveyors & Dumpers, Inc.,* 731 F.2d 1221, 1227 (5th Cir.1984) ("[T]he court is not compelled to give even every correct instruction offered by the parties."). We afford trial judges wide latitude in fashioning jury instructions. *See, e.g., Corey v. Jones,* 650 F.2d 803, 806 (5th Cir.1981). Moreover, in reviewing a claim that the jury has been erroneously instructed, we view the charge as a whole, in the context of the entire case, and we ignore technical imperfections. "We must determine 'not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.'" *McCullough v. Beech Aircraft Corp.,* 587 F.2d 754, 759 (5th Cir.1979) (quoting *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1100 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)).

 We will reverse "[i]f the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *McCulluough,* 587 F.2d at 759 (quoting *Kyzar v. Vale Do Ri Doce Navegacai, S.A.,* 464 F.2d 285, 290 (5th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973)). We will not reverse, on the other hand, "if we find, based upon the record, that the challenged instruction could not have affected the outcome of the case." *Bass v. USDA,* 737 F.2d 1408, 1414 (5th Cir.1984). When an objection is made to the failure to give a requested instruction, the correctness of the proposed instruction must, of course, be shown as a threshold matter. The ultimate test remains, however, whether the instructions that were actually given were adequate: "A party is entitled to reversal for a district court's failure to give a particularly requested instruction only if the jury was misled by the instructions that were actually given. The court is under no obligation to couch the charge in terms requested by counsel." *Wyatt v. Penrod Drilling Co.,* 735 F.2d 951, 955 (5th Cir.1984). With these principles in mind, we turn to the specific liability instructions involved in this appeal.

### C. *Conspiracy Definition.*

 Concerted action is, of course, a fundamental prerequisite to liability under section one of the Sherman Act. Long ago, the Supreme Court made clear that a "manufacturer engaged in an entirely private business [is free] to exercise his own *independent* discretion as to parties with whom he will deal." *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919) (emphasis supplied). The Court has recently reaffirmed the vitality of this principle, which has become known as the *Colgate* doctrine. In *Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——,

---

**10.** Of course, in order to have the jury instructed on a theory of the case, (1) the instruction must be legally correct; (2) the theory must be supported by the evidence; and (3) the desired instruction must be brought to the court's attention in a timely manner. *See Corey v. Jones,* 650 F.2d 803, 806 (5th Cir.1981). As noted in the text, the court may refuse proposed instructions that meet these criteria if the charge that is given covers the theory in substance; the judge, not the parties, has control over the language and form of jury instructions. *Id.*

104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), a dealer termination case like this one, the Court made clear that a manufacturer's independent decision to refuse to supply a distributor, even if prompted by the distributor's refusal to adhere to the manufacturer's suggested resale price, does not violate section one of the Sherman Act. Said the Court: "Under *Colgate,* the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." *Id.* 104 S.Ct. at 1469. "A conscious commitment to a common [unlawful] scheme," on the other hand, between a manufacturer and his distributors may violate the Sherman Act. In the context of distributor termination, however, evidence of complaints from other distributors, followed by termination, is *not* a sufficient basis from which to infer concerted action. If plaintiff's evidence goes no further, a directed verdict under the *Colgate* doctrine is appropriate. To get to the jury, plaintiff must present evidence, beyond mere complaints, that "tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* at 1471.

Ramsey argues, not that Pierce Sales' evidence was insufficient to overcome the *Monsanto* directed verdict standard, but that the court's charge allowed the jury to find a price-fixing conspiracy from facts that, under *Monsanto,* are insufficient to justify an inference of concerted action. Ramsey places principal reliance on *Borger v. Yamaha International Corp.,* 625 F.2d 390 (2d Cir.1980). In *Borger,* plaintiff claimed that the defendant-wholesaler violated section one of the Sher-

man Act when it refused to grant the plaintiff a franchise to retail stereo components. Plaintiff alleged that the decision to deny it a franchise was made pursuant to concerted action between defendant and its other franchisees. There was evidence that, before making the decision to deny plaintiff a franchise, defendant consulted with franchisees in the area surrounding plaintiff's store. The trial court instructed the jury that, in order to find a violation of section one, it was necessary to find that the defendant had reached an express or implied agreement to deny plaintiff a franchise with the franchisees with whom it consulted. On appeal, defendant argued that the court's instruction with respect to the requisites of concerted action did not go far enough. Although expressly refusing to decide whether the judgment for plaintiff should be reversed on this ground, the court suggested that the jury should have been further instructed "that it was not improper for [defendant] to consult with its dealers and that those consultations, standing alone, would not establish the existence of a combination or agreement under the Sherman Act." *Id.* at 395.

Ramsey's proposed instruction no. 4 is similar in scope to the instruction suggested by the *Borger* court. The instruction would have made absolutely clear to the jury that it could not find concerted action from distributor complaints followed by termination.[11] As we have already discussed, however, the court was not obligated to give the instruction if the court's charge already adequately conveyed to the jury the requirements for a finding of combination or conspiracy.

The court's charge,[12] we think, adequately defined combination and conspiracy for

---

**11.** Proposed instruction no. 4, which, in light of *Monsanto,* is undoubtedly a correct statement of the law, reads as follows:

You are instructed that the mere fact that a manufacturer receives complaints about one of its distributors from other distributors or customers does not establish the existence of a combination, contract or conspiracy under § 1 of the Sherman Antitrust Act, even when such complaints are followed by a termination of that distributor by the manufacturer.

Supp. Record Vol. I at 8.

**12.** The court instructed the jury as follows:

A *combination or conspiracy* is formed when two or more persons knowingly join together to accomplish some unlawful purpose by concerted action. To act knowingly is to act voluntarily and intentionally, and not because of mistake or accident. The essence of a combination or conspiracy is an agreement between two or more persons to violate

the jury. The charge made clear that, in order to find a section one conspiracy, the jury had to find an agreement. Moreover, the charge indicated that neither similarity of conduct, nor discussion of common goals, is sufficient, standing alone, to establish a combination or conspiracy. Ramsey makes much of the fact that the charge states that similarity of conduct and discussion of common goals do "not necessarily" establish a combination or conspiracy. Ramsey argues that, by phrasing the instruction in this manner, the court, in effect, told the jury that, although it did not have to find a combination or conspiracy from these facts, it was free to do so. We disagree. In the context of the charge as a whole, we think that inclusion of the word "necessarily" simply informed the jury, as is the law, that they could consider similarity of conduct and discussion of common goals as *some* evidence of conspiracy or combination, but that, to find liability, more was required. *See Monsanto,* 104 S.Ct. at 1471. The court's charge went on to inform the jury that the "evidence *must* show, in order to establish proof that a combination or conspiracy existed, ... that the members ... came to or knowingly acquiesced in a mutual agreement or understanding to accomplish a common and unlawful plan." (Emphasis supplied.)

We are convinced that, although clearer instructions could have been given, the charge as a whole adequately conveyed the essence of the principles embodied in *Monsanto.* We note that *Borger* obviously does not have the authoritative weight that Ramsey would give it. As we have already noted, the *Borger* court refused to decide whether the perceived incompleteness of the jury instruction would merit reversal. Moreover, in *Borger* the "evidence of a vertical combination [was] largely inferrential." *Id.* at 395. In our case, however, there is substantial direct evidence that Ramsey conspired with its distributors. In short, we find that the charge sufficiently informed the jury, though not in these exact words, that distributor complaints followed by termination does not constitute a conspiracy or combination.[13]

#### D. *Business Justification.*

Ramsey's position throughout trial and on appeal has been that, even if Ramsey did conspire to fix prices, Pierce Sales was not terminated because it failed to adhere to the price dictated by the conspiracy. Rather, Ramsey claims, Pierce Sales was lawfully terminated because it began to solicit orders directly from other Ramsey distributors. Ramsey requested a specific jury instruction on this defensive theory. Proposed instruction no. 7A stated:

In this connection, you are instructed that the antitrust laws of the United

---

or disregard the law. However, the evidence in the case need not show that the members of the alleged combination or conspiracy entered into any express or formal agreement.

Mere similarity of conduct among several persons, and the fact that they may have associated with each other, and may have assembled together and discussed common aims, and interests, does not necessarily establish proof of the existence of a combination or conspiracy.

However, the evidence in the case need not show the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished. What a preponderance of the evidence in the case must show, in order to establish proof that a combination or conspiracy existed, is that the members in some way

or manner, expressly or impliedly, came to, or knowingly acquiesced in, a mutual agreement or understanding to try to accomplish a common and unlawful plan.

You are instructed that there must be at least two separate persons who have reached an agreement or understanding in order to find a combination or conspiracy was formed. In that regard, you are instructed that a single corporation cannot agree, combine or conspire with its own officers or employees so as to supply the collaborative element for a Sherman Act violation.

Record Vol. I at 217–20.

**13.** We note that, during closing argument Ramsey took the position that, even if it did coerce resale price maintenance from its distributors, Pierce Sales was terminated for valid independent reasons. Clearly, the issue that most concerned Ramsey was the distributor solicitation issue.

States do not require a company to allow its own distributors to compete with it. Otherwise stated, it is sufficient justification for a manufacturer to terminate a distributor for disloyalty if that distributor has been competing with the manufacturer.

Record Vol. I at 209. We note at the outset that there is certainly evidentiary support in the record for submission of this defensive theory to the jury. There is evidence from which the jury could have found, for example, that Pierce Sales raised its prices to the level demanded by Ramsey and that termination did not occur until Pierce Sales mailed its inventory and price-list to other distributors.

 We think, however, that the court's charge adequately encompasses Ramsey's defensive theory,[14] and we find no reversible error in the failure to submit the issue to the jury in the precise language of proposed instruction no. 7A. It is true that the court's instruction does not state unequivocally that disloyalty is a lawful reason for termination. The instructions do state, however, that a manufacturer may terminate a distributor for any reason that does not violate the antitrust laws. The only violation of the antitrust laws that is discussed thereafter in the charge is vertical price-fixing. The charge is devoid of instructions from which the jury could have mistakenly concluded that termination of a distributor who seeks to compete directly with the manufacturer for the business of other distributors violates the antitrust laws. Moreover, directly following an instruction that Ramsey claims to have terminated Pierce Sales for a lawful reason, the charge states that "[Ramsey] contends that it terminated Plaintiff for soliciting business from Defendant's other distributors." The clear implication from the proximity of these instructions, as well as from the rest of the charge, is that termination for soliciting orders from other distributors is not unlawful.

Ramsey argues that our decision in *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384 (5th Cir.1983), requires reversal of the judgment in this case. We disagree. In *Hornsby*, plaintiff complained that the defendant-manufacturer terminated plaintiff's distributorship, in violation of the Sherman Act, because plaintiff refused to comply with unreasonable product and territorial restrictions. We reversed a judgment for plaintiff because the magistrate failed to instruct the jury, as is required in a rule of reason case, on the relevant product and geographic markets. We also found error in the trial court's failure to instruct the jury on defendant's theory of the case. The manufacturer maintained that plaintiff's distributorship was cancelled because plaintiff reported false sales information. We held that the manufacturer was entitled to a jury instruction that "the manufacturer[ ] [has the] prerogative to refuse to deal with a

---

**14.** The court's instructions on Ramsey's theory of the case are as follows:

> In this connection you are instructed that a manufacturer, such as Defendant Ramsey Winch Company, has a right to terminate its distributors so long as the termination does not result from a violation of the antitrust laws.
>
> * \* \* \* \* \**
>
> Section 1 of the Sherman Act is a statute that makes unlawful agreements that constitute unreasonable restraints of trade. Section 1 reads as follows:
>
>> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal.
>
> Plaintiffs allege a price fixing agreement or arrangement or conspiracy between Defendant Ramsey Winch Company and one or more of its distributors for the distributor to sell Ramsey's products at an artificially high price in violation of Section 1 of the Sherman Act. Plaintiffs claim that Defendant Ramsey Winch Company attempted to promulgate and enforce an illegal price maintenance scheme by threatening termination and later terminating Plaintiffs' distributorship for failure to comply with Defendant Ramsey Winch Company's price maintenance scheme.
>
> The Defendant denies that it conspired to fix prices. The Defendant contends that it terminated the Plaintiff solely for lawful reasons. It contends that it terminated Plaintiff for soliciting business from Defendant's other distributors.

Record Vol. I at 217.

customer for business reasons independent of the conspiracy." *Id.* at 1397. We concluded that the court's charge, which instructed the jury that "[d]efendant claims that it properly terminated plaintiff's distribution contract, unilaterally, for the reason that plaintiff falsely reported its sales to Champion," did not go far enough.

■ We do not endorse a barebones charge like the one given in this case for all future cases. We do conclude, however, that the court's instructions barely sneak by the line that we drew in *Hornsby*. The jury here, unlike the *Hornsby* jury, was instructed that a manufacturer can refuse to deal with a distributor for reasons independent of the price-fixing conspiracy. Although Ramsey's proposed instruction would have tied that concept more closely to the facts of this case, we find, after viewing the charge as a whole, that the jury was not misled. We are comforted, moreover, by the fact that Ramsey had ample opportunity to argue to the jury that termination prompted by a distributor's attempts to compete directly with the manufacturer is lawful. Obviously, we do not hold that a defective jury charge can, in all cases, be cured if counsel is permitted to argue materials omitted from the charge in closing argument. We think it is clear, however, that an opportunity to argue specific matters consistent with, although not explicitly spelled out in, a general instruction may ameliorate the harm flowing from the failure of the charge to specifically tie the law to the facts of the case. *See, e.g., Kestenbaum v. Falstaff Brewing Corp.,* 575 F.2d 564, 569 (5th Cir.1978) ("The district court, however, adequately instructed the jury on the general question.... Given the repetitive nature of [defendant's] proof, and counsel's argument, the jury can hardly have failed to grasp the idea [embodied in defendant's requested jury in-

struction].”), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). In this case, Ramsey argued repeatedly to the jury that, according to the law stated in the court's charge, it had every right to terminate Pierce Sales for soliciting business from its distributors. We are convinced, by the charge as a whole and Ramsey's vigorous argument, that the jury was not misled.

## IV. DAMAGES.

■ Pierce Sales claims that termination of its Ramsey distributorship caused damage to its business in the form of lost profits.[15] Pierce Sales set out to prove its damages, from the date of termination to the date of trial, by (1) projecting the number of Ramsey winches it could have sold during this period if the supply had not been cut off; (2) subtracting from projected sales the number of substitute-brand winches that it actually sold; and (3) multiplying the result, which represents the number of lost winch sales, by the dollar figure representing Pierce Sales' per-winch profit. Pierce Sales' expert did this calculation for the jury and reached a total lost profits figure of $705,238.45. Despite Ramsey's evidence that Pierce Sales' damage model is unrealistic and that Pierce Sales' business has in fact boomed since termination of its Ramsey distributorship, the jury returned a verdict in the exact sum suggested by Pierce Sales' expert. Before considering Ramsey's attack on the sufficiency of the evidence to support this award, we consider certain evidentiary rulings which, according to Ramsey, contributed to the excessiveness of the verdict.

### A. *Ramsey's Damages Exhibits.*

Ramsey claims that the district court erred by refusing to admit Ramsey exhibits 30 and 32.[16] Both exhibits consist of num-

---

**15.** Clearly, lost profits are a proper measure of damages in a distributor termination case. If termination forces the plaintiff out of business, going concern value is an alternative measure of damages. *See, e.g., Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 663–64 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d

400 (1975); *Graphic Products Distributors v. Itek Corp.,* 717 F.2d 1560, 1579 (11th Cir.1983).

**16.** This claim has been properly preserved for our review. When, after the court sustained Pierce Sales' objections to exhibits 30 and 32, Ramsey asked for a chance to be heard, the

bers on a large sheet of paper; both were prepared on an easel during trial, while witnesses were testifying, to illustrate their testimony. Exhibit 30 lists the number of Ramsey winches sold each month by Pierce Sales during 1978. George Pierce testified to these figures by reading portions of his deposition. Record Vol. III at 215. Ramsey's counsel then received the court's permission to write the figures on the easel located in the courtroom. Much later, during the testimony of Gregory Entwistle, Ramsey's damages expert, an addition to exhibit 30 was made. In the right hand corner of exhibit 30, Entwistle printed an equation through which, according to his testimony, he accurately calculated the net profit realized by Pierce Sales on each winch sold during 1978.[17] Record Vol. VI at 729.

Exhibit 32 was also prepared during trial, apparently by Entwistle.[18] Entwistle testified that, in his view, Pierce Sales did not lose any profits as a result of the termination of its Ramsey distributorship. He based this conclusion, in part, on Pierce Sales' tax returns, admitted at trial, which show that, since termination in 1978, Pierce Sales' gross sales and gross income have increased markedly. On exhibit 32, he listed Pierce Sales' gross sales and gross income for the years 1978 through 1982; these figures were taken directly from the tax returns. The exhibit also includes the notation that gross sales increased three and one-half times and gross income increased seventeen times during this period. Finally, the exhibit includes figures that, although not so named on the exhibit itself, Entwistle identified as Pierce Sales' gross profit percentages for the years 1978 through 1982.[19]

Pierce Sales objected to exhibits 30 and 32 on the ground that they are cumulative because they recite figures already in evidence from other sources. On appeal, Ramsey argues that the court erred in sus-

---

court responded "Not now." Record Vol. VI at 758. While making objections to the charge, however, Ramsey asked that exhibits 30 and 32 be sent to the juryroom with the rest of the exhibits. *Id.* at 788. By stipulation, exhibits 30 and 32 were included in the appellate record now before us. Supp.Record Vol. 2 at 14.

**17.** The equation is as follows:

$$\frac{\begin{array}{r}\$5,203.00 \\ 1,624 \end{array}}{\$3.20}$$

$5,203.00 is Pierce Sales' net income, as reported on its tax return, for 1978. Pierce Sales sold 1,624 winches in 1978. Ramsey's expert simply divided the number of winches sold into net profits and arrived at a net profit-per-winch of $3.20. This figure differs drastically from the $35.00 profit-per-winch factor used by Pierce Sales' expert. See Part IV, C *infra.*

**18.** Pierce Sales argues that exhibit 32 was prepared by Ramsey's counsel, not by Entwistle, from figures supplied by Entwistle. Appellee's Brief at 32. The record does not state whether Ramsey's counsel or Entwistle actually wrote the figures on the easel. The colloquy between counsel and Entwistle strongly suggests, however, that it was Entwistle:

Q. All right, sir. Could you explain to the Jury how you can establish the trend his business actually had and what the results are?
. A. Yes, I can. The income tax returns indicate ... well, it will be much clearer if I can put it on the board, if that's all right?

Q. All right. Would you go ahead and illustrate the information you're using for your calculations for the Jury, so, they'll know what you're basing it on?
A. Okay. This is the information that I wanted to summarize for you.

Record Vol. VI at 731. Presumably, exhibit 32 was composed by Entwistle during the explanation that follows this exchange in the record. As our discussion in the text indicates, the identity of exhibit 32's draftsman is not material to our decision. We simply note that Pierce Sales' argument that exhibit 32 was properly excluded because it was "counsel-generated" is unconvincing.

**19.** The exhibit looks like this:

| | Gross Sales | 3.5x | Gross Income | 17x | % |
|------|-------------|------|--------------|-----|------|
| 1982 | 3,550,077 | | 676,177 | | 10.05 |
| 1981 | 3,866,930 | | 240,819 | | 6.23 |
| 1980 | 2,400,515 | | 149,662 | | 6.23 |
| 1979 | 1,573,732 | | 73,129 | | 4.65 |
| 1978 | 957,532 | | 39,012 | | 4.07 |

As noted, the figures in the gross sales and gross income columns are drawn directly from Pierce Sales' tax returns, Defendant's ex. nos. 11 through 15. Although Entwistle did not explain how he calculated the figures in the percentage column, obviously he simply divided gross income by gross sales and multiplied by one hundred.

taining the objection because (1) the exhibits are not cumulative and (2) since the court admitted the damages exhibits of Pierce Sales' expert witness, Ramsey's exhibits likewise should have been admitted.

■ Neither party has bothered to cite to the evidentiary rules governing the admissibility of charts and summaries. When considering the admissibility of exhibits of this nature, it is critical to distinguish between charts or summaries *as evidence* and charts or summaries *as pedagogical devices*. 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 1006[07] (1983). Rule 1006, Fed.R.Evid., provides that the contents of voluminous records "may be presented in the form of a chart, summary, or calculation." A chart admitted pursuant to Rule 1006 is itself evidence and should go to the juryroom during deliberations along with the other exhibits. Of course, the rule provides protections against abuse: "The originals, or duplicates, [of the records summarized in the chart] shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court."

■ A trial court also has the discretion to permit the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence. Charts of this nature are not themselves evidence and, absent the consent of all parties, they should not be sent to the juryroom with the other exhibits. *Weinstein's Evidence* at ¶ 1006[07]. Our cases have not always made this distinction clear. We have made clear, however, that a district court does not err in informing the jury that pedagogical charts are *not* evidence or in refusing to send them to the juryroom. *See, e.g., United States v. Evans,* 572 F.2d 455, 492 (5th Cir.1978), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58

L.Ed.2d 182 (1979); *United States v. Smyth,* 556 F.2d 1179, 1184 n. 11 (5th Cir.), *cert. denied,* 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977).

■ Exhibit 30 is clearly a pedagogical device which merely summarizes and organizes data already in evidence. The number of winches sold during 1978 was in evidence through George Pierce's testimony. The equation which was added to exhibit 30 is simply a summary of Entwistle's testimony. The figures used in the equation were also in evidence from other sources: George Pierce testified that Pierce Sales sold 1,624 winches in 1978; Pierce Sales' tax return reveals that Pierce Sales realized a net profit in 1978 of $5,203. We discern no error, therefore, in refusing to admit exhibit 30 into evidence. The district court had the discretion to permit its use before the jury; the court was not obligated, however, to allow it into evidence.

Exhibit 32 is also a pedagogical device which merely summarizes documentary and testimonial evidence. The gross sales and gross income figures on the exhibit are drawn directly from tax returns already in evidence. The other figures on the chart simply summarize Entwistle's calculations, about which he testified in court.

■ Ramsey's argument that admission of Pierce Sales' damages exhibits perforce rendered its own exhibits admissible is unconvincing. If Ramsey felt that Pierce Sales' damages exhibits were inadmissible, it was certainly free to object to their admission and, if unsuccessful below, to urge in this court that the judgment should be reversed on that ground.[20] We are aware of no rule, however, that the admission of one party's exhibits on a given issue automatically renders admissible all exhibits of the other side that bear on the same issue.

**20.** Ramsey objected to Pierce Sales' damages exhibits, Plaintiff's ex. nos. 67 through 71, "on the grounds of improper foundation and highly speculative." Record Vol. IV at 351. This objection, which was overruled, does not raise the issue presented by the treatment of Ramsey's exhibits: the admissibility of an exhibit purporting to summarize data already in evidence. At any rate, Ramsey does not argue on appeal that the court erred in overruling its objection to Pierce Sales' exhibits.

At any rate, we note that most of Pierce Sales' damage exhibits, which will be discussed in more detail later in this opinion, qualify for admission under Rule 1006 as summaries of records not themselves in evidence. As noted, Ramsey failed to object, on this ground, to admission of those that merely summarize evidence itself admitted at trial, and we discern no plain error in their admission.

### B. *Jury Instructions on Mitigation.*[21]

Ramsey complains that the trial court erred in refusing to give the jury its requested instruction no. 13A on Pierce Sales' duty to mitigate damages. Again, our review of this issue centers, not on the correctness of the requested instruction, but on the sufficiency of the mitigation instruction that was actually given. *See* Part III, B, *supra.* Ramsey's objection to the court's charge on mitigation is that the instruction simply states the abstract legal principle of mitigation but does not specifically tie it to the facts of this case.

■■■ The court's instruction on mitigation is in substance nearly identical to Ramsey's requested instruction no. 13A.[22] Ramsey's version is slightly more specific; instruction no. 13A cites, as an example of a reasonable step to avoid damages, "securing a supply of similar goods to replace those previously furnished by the terminat-

ing manufacturer." Record Vol. I at 210. We fail to see, however, how omitting that specific example could have harmed Ramsey. It was undisputed that, following termination, Pierce Sales began to sell winches manufactured by other companies. Pierce Sales' damage model, which the jury apparently accepted in toto, accounted for sales of these substitute winches. Ramsey's real complaint about mitigation is that the jury did not consider profits earned by Pierce Sales from non-winch items. Requested instruction no. 13A does not address mitigation of this type. We find no error, therefore, in the court's refusal to instruct the jury in the precise language of Ramsey's requested instruction.

### C. *Improper Closing Argument.*

Ramsey argues that the damage award in this case was influenced by passion and prejudice. It bases this argument on two specific examples of allegedly improper jury argument: (1) Pierce Sales informed the jury that, if it answered all three liability interrogatories "yes," Pierce Sales would prevail and (2) Pierce Sales accused Ramsey of fabricating its defense.

The court instructed the jury "not [to] decide who you think should win and then try to answer the [court's interrogatories]

---

**21.** Ramsey also argues in a conclusory fashion that "[t]he Court's charge unduly emphasized that the plaintiff is not required to prove the amount of damages to a mathematical certainty; while at the same time understating the equally important rule that only actual damages may be assessed." Appellant's Brief at 37. We have carefully reviewed the court's charge and are satisfied that it strikes a fair balance between the need to avoid speculation and the rule that difficulty of ascertainment of damages should not benefit the party whose conduct has caused that difficulty.

**22.** The court's mitigation instruction is as follows:

You are instructed that Plaintiffs are not entitled to recover an element of damages which could have been avoided through the exercise of reasonable efforts on their part. Plaintiffs are not entitled to increase their damages through inaction, but must have tak-

en all reasonable steps to mitigate their damage and reduce their loss.

Should you find that Plaintiffs could reasonably have avoided the losses claimed, you must limit Plaintiffs' damages to those losses which they would have suffered had they attempted to mitigate their damages.

Record Vol. I at 13. Proposed Instruction 13A reads:

You are instructed that a distributor of goods who alleges that it has been unlawfully terminated by its manufacturer has the duty to mitigate any damages it may have suffered by reason of such action. That is to say, it must take reasonable steps to reduce any such damages, such as securing a supply of similar goods to replace those previously furnished by the terminating manufacturer. You are further instructed that a plaintiff cannot recover any damages that it reasonably could have mitigated but did not.

Record Vol. I at 210.

accordingly." Record Vol. I at 211. During closing argument, Pierce Sales argued as follows:

> And I further say to you that in order to win and prevail in this case, Pierce must have all three issues answered "yes." So if you believe that they are right, if you believe that they are proper, you should so answer those questions in order for them to prevail. And your failure to do so would result in a continuation of this price fixing conspiracy.

Record Vol. VI at 852. Ramsey's objection to this argument was overruled. *Id.* Ramsey now claims that Pierce Sales' argument invited the jury to violate the court's instructions and constitutes reversible error.

Pierce Sales also argued, in summarizing its view of the evidence surrounding termination of its distributorship, that termination was not based, as Ramsey claimed, on poor warranty work or solicitation of other distributors. Pierce Sales argued that:

> Now, Ladies and Gentlemen of the Jury, Ramsey Winch knew it was a violation of the law to do that and that's why they have turned and brought to you all this hobbledygook about warranty and service and other dealers and one thing and another because they knew the spotlight of truth would bring out the fact that they had an illegal price conspiracy or tried to fix prices.
>
> They couldn't admit that that's what they did. So they had to come up with some excuses and that's why nobody ever mentioned service and warranty until after this lawsuit was filed. And that's why suddenly, after it got to the lawyer's office or something and they sorted through the papers and he said, oh, maybe this will do. Maybe we can convince some jury that you terminated them because of, ... [m]aybe we can convince some jury that you terminated them because he mailed this out. But isn't it passing strange that everybody that ever sold a Ramsey winch at a discount is no longer a distributor?

Record Vol. VI at 853. Ramsey's objection to this line of argument was also overruled.

Ramsey now claims that, through this argument, Pierce Sales suggested that Ramsey fabricated its defense.

▮ Both of these claims were presented to the district court in a motion for new trial. Record Vol. I at 246. Our review is limited to determining whether, in overruling that motion, the district court abused its discretion. As we said in *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 799 (5th Cir.1983) (quoting *Meyers v. Moody*, 693 F.2d 1196, 1220–21 (5th Cir. 1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983)), "[i]t is well established that a motion for new trial based upon inflammatory remarks is addressed to the sound discretion of the trial judge, and his ruling thereon will not be disturbed absent an abuse of that discretion."

We are reluctant to substitute our judgment for that of the trial court:

> The rule in this circuit is that "unless the conduct of counsel or witnesses is such as to impair gravely the calm and dispassionate consideration of the case by the jury, no error flows from the refusal of the trial court, in the exercise of its discretion, to vitiate the trial."

*Crown Colony Distributors, Inc. v. United States Fire Insurance Co.*, 510 F.2d 544, 545 (5th Cir.1975) (quoting *Spach v. Monarch Insurance Co.*, 309 F.2d 949, 953 (5th Cir.1962)). We cannot say, based upon the "isolated and brief instances during the course of an ... otherwise fairly litigated trial," to which Ramsey has drawn our attention, that a new trial is mandated. *Meyers*, 693 F.2d at 1221.

▮ With respect to the first alleged impropriety, we note that, contrary to the practice of some of the state courts within our circuit, federal courts are free to tell juries the effect of their answers to special interrogatories. *See, e.g., Martin v. Texaco, Inc.*, 726 F.2d 207, 216 (5th Cir.1984). We, of course, do not sanction argument that encourages the jury to disregard the court's instructions. We think, however, that, fairly read, Pierce Sales simply argued that, based on the evidence, the jury

could answer the interrogatories "yes," and, if they did so, Pierce Sales would prevail. Even if the jury understood Pierce Sales to be asking it, in violation of the court's instructions, to first decide who should win, and then to answer the interrogatories accordingly, we do not think that such a fleeting request would justify a new trial. The jury was expressly instructed to answer the interrogatories based on the evidence. We refuse to presume, based on Pierce Sales' brief statement, that the jury disregarded the court's instructions and simply decided who it wanted to win. *Cf. Crown Colony,* 510 F.2d at 545.

■ With respect to the claim that Pierce Sales accused Ramsey of fabricating its defense, we also find that the district court did not abuse its discretion in refusing to grant a new trial. Pierce Sales was certainly entitled to argue that the business reasons proffered by Ramsey for terminating Pierce Sales' distributorship were merely a pretext for enforcing a resale price maintenance scheme. It is undoubtedly a fair inference from the evidence in the record that price, not warranty work or distributor solicitation, motivated Ramsey in its decision to terminate Pierce Sales. We agree that, to the extent that Pierce Sales' argument can be construed as an attack on the integrity of counsel for Ramsey, it was overzealous. There is no suggestion in the record that Ramsey or its lawyers deliberately plotted to present perjured testimony. We think, however, that Pierce Sales' argument, while it starts down that path, does not go very far in impugning counsel or in arguing matters outside the record. Based upon the fleeting nature of the remarks, we find no abuse of discretion in refusing to grant a new trial on this ground.

### D. *Sufficiency of the Evidence.*

Ramsey claims that the evidence is insufficient as a matter of law to support the jury's damage award. This claim was preserved for appellate review by motions for directed verdict and judgment notwithstanding the verdict. We must, of course, uphold the denial of these motions if "there is substantial evidence" supporting the verdict—"that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc). Ramsey argues, in effect, that reasonable and fair-minded jurors could not have found from the evidence in this case that Pierce Sales was damaged by the termination of its Ramsey distributorship. Even if they could reasonably find damages, Ramsey goes on to argue, the amount awarded in this case was grossly excessive. Private antitrust suits present special problems in the area of assessing damages. Before reviewing the evidence in this case, we will consider some of the principles that have been developed to assist us.

■ Antitrust damages are often difficult to prove. This is due in part to the "vagaries of the marketplace [which] usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne & Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981). It is also due in part to the nature of antitrust violations. *See, e.g., H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 246 (5th Cir.1978) (often, "[t]he very nature of the antitrust violation deprives [plaintiff] of direct evidence" of damages). In a distributor termination case, for example, the defendant's decision to cut off the source of supply forces an aggrieved plaintiff who seeks compensation for lost profits, in effect, to prove sales that he never had a chance to make. *See Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 23 (5th Cir.), *cert. dism'd,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). An exacting burden of proof on antitrust damages, therefore, would render nugatory the value of private enforcement of the antitrust laws and would reward antitrust violators for particularly egregious conduct. An overly lax

standard, on the other hand, would provide antitrust plaintiffs with a windfall and would violate the established principle that an injury without damage creates no right to compensation. *See Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 987 (5th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). The Supreme Court has consistently struck the balance between these competing concerns by separating the inquiry into the fact of antitrust injury from the computation of the amount of antitrust damages: an antitrust plaintiff must prove by a preponderance of the evidence some "element of actual damage caused by the defendant's violation of the antitrust laws." *Multiflex,* 709 F.2d at 989. Once the fact of damage has been established, plaintiff enjoys a relaxed burden with respect to the amount of damages. *Id.* *See also J. Truett Payne Co.*, 451 U.S. at 566, 101 S.Ct. at 1929. Under this relaxed burden, a jury verdict may stand on less evidence than is normally required to support a damage award in civil cases. *Id.* While rank speculation will not be tolerated, "[e]vidence sufficient to support a 'just and reasonable inference of damages suffices.'" *Jot-Em-Down Store Inc. v. Cotter & Co.*, 651 F.2d 245, 248 (5th Cir.1981) (quoting *J. Truett Payne Co.*, 451 U.S. at 557, 101 S.Ct. at 1923). *See also Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

We read Ramsey's brief to assert that the evidence is insufficient to establish fact of damage and, in the alternative, that the evidence is too speculative to meet even the relaxed burden of proof with respect to the amount of Pierce Sales' damages. We consider these claims in turn.

### 1. *Fact of Damage.*

"The term 'fact of damage' can be likened to the causation element in a negligence cause of action. The term means simply that the antitrust violation caused injury to the antitrust plaintiff." *State of Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir.1978). On fact of damage, therefore, our inquiry is whether Pierce Sales' evidence shows as "a matter of fact and with a fair degree of certainty" that loss of its Ramsey distributorship caused injury to its business. *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d at 20. *See also Chrysler Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 581 (5th Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982); *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1321 (5th Cir.1976).

The showing necessary to establish fact of damage necessarily depends on the nature of the antitrust violation. *See J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 792 (5th Cir.1983) ("We start [the fact of damage analysis] with the nature of the antitrust violation....."). Fact of damage in a horizontal price-fixing case, for example, "may be shown simply by proof of purchase at a price higher than the competitive rate." *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir.1982). In a concerted refusal to deal case, we have said that "[t]he *sine qua non* of the injury caused by a refusal to deal [is] inability to obtain the product. From this failure to obtain the product would flow subsidiary consequences: loss of sales or market share because of the failure to sell or utilize the product." *J.T. Gibbons,* 704 F.2d at 792. In *J.T. Gibbons,* we noted, therefore, that an antitrust plaintiff in a refusal to deal case can survive a motion for directed verdict on the fact of damage issue with evidence of (1) an inability to obtain the desired product or (2) if an alternative source of the product is obtained, decreased revenues or increased costs associated with the substitute source of supply. *Id.*

Obviously, the *sine qua non* of injury in a dealer termination case, as in a concerted refusal to deal case, is an inability to obtain the product. A jury question on fact of damage, therefore, can often be

established simply by showing that, following termination, plaintiff, because he lacked the terminating manufacturer's product, suffered a decline in gross sales. *See Greene v. General Foods Corp.*, 517 F.2d 635, 665 (5th Cir.1975) ("there was sufficient evidence for the jury to conclude that Greene's business had been injured in fact because of the termination, if only in that his gross sales immediately declined by some $207,000 in the next fiscal year"), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976). *See also Graphic Products*, 717 F.2d at 1579 n. 35 ("decline in gross sales in the year following termination of a distributorship ... [is] sufficient evidence of causation of antitrust injury in fact"). Of course, an antitrust plaintiff, like other injured parties, must mitigate damages. *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 436 (5th Cir.1977). Since defendant bears the burden of demonstrating a failure to mitigate, however, plaintiff can get to the jury on fact of damage without showing that he took steps to obtain products to substitute for those previously supplied by the terminating manufacturer. *See Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 860–63 (5th Cir.), *cert. denied*, 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981). Thus, it may well be enough to show declining sales following termination. *Greene*, 517 F.2d at 665; *Malcolm*, 642 F.2d at 863.[23]

Pierce Sales, however, cannot show declining sales. As noted, Pierce Sales' gross profits have risen sharply since termination. For this reason, Ramsey's argument that Pierce Sales was not in fact injured by termination indeed has a surface appeal.

It is clear, however, that an antitrust plaintiff's post-violation successes do not necessarily preclude compensation for damages proximately caused by an antitrust violation. *See, e.g., Multiflex*, 709 F.2d at 994; *Feminist Women's Health Center v. Mohammad*, 586 F.2d 530, 547 (5th Cir.1978), *cert. denied*, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). Improvement in a distributor's business following termination, it seems to us, necessarily flows from (1) a diversion of the resources that were previously devoted to selling products supplied by the defendant; (2) successes in an aspect of the business unrelated to an expenditure of resources freed up by termination; or (3) a combination of these two sources. If the distributor's successes flow from the utilization of resources other than those previously devoted to selling defendant's products, post-termination profits would have no bearing on the fact of damage flowing from termination. If the evidence shows, on the other hand, that post-termination profits exceed pre-termination profits, and that they are attributable to the use of resources diverted because of termination to other endeavors, it would seem at least possible that post-termination endeavors are more profitable for plaintiff than operation of defendant's distributorship. We do not think, however, that a plaintiff is necessarily precluded from showing fact of damage in this latter situation. He may demonstrate fact of damage, we think, by showing that (1) he lost sales or revenues during the lag period between termination and the completion of his efforts to divert resources to substitute endeavors and (2) although his substitute endeavors proved more profitable than distribution of defendant's prod-

---

**23.** That is not to say that a directed verdict or j.n.o.v. is always inappropriate if, following distributor termination, plaintiff suffers a decline in business. Plaintiff's burden, of course, is to show, not that the antitrust violation was the sole cause of injury, but that it was a material cause. *E.g., Blue Bird Body Co.*, 573 F.2d at 317. Generally, if a distributor-plaintiff shows that (1) his supply was cut off and (2) his business' gross sales declined, he has created a jury question with respect to whether termination caused his injury. *Greene*, 517 F.2d at 635. It may

nonetheless be necessary to take the case from the jury if defendant carries his burden, with evidence sufficient under the *Boeing* standard to warrant a directed verdict or j.n.o.v., of showing that, because of a failure to mitigate, plaintiff's losses are attributable, not to the antitrust violation, but to plaintiff's own conduct. *See, e.g., Malcolm*, 642 F.2d at 863 ("We agree that in a refusal-to-deal case, a plaintiff who bypasses an obviously adequate alternative supplier should not recover for the loss of his business.").

ucts did immediately prior to termination, sales or profits from defendant's products would have increased, but for termination, to a level sufficient to earn him greater profits than his substitute endeavors did. He cannot, however, make this showing through speculation or through reliance on unfounded assumptions. *See, e.g., Chrysler Credit Corp.*, 670 F.2d at 581 ("Conclusory statements by the plaintiff, without evidentiary support, as to the fact of damage ... are not sufficient."); *H & B Equipment Co.*, 577 F.2d at 247 ("When the fact of injury is in issue, the 'isolated and self-serving statements' of plaintiff[ ] ... may not provide substantial evidence upon which a jury can rely.") (quoting *Yoder Bros., Inc. v California-Florida Plant Corp.*, 537 F.2d 1347, 1371 n. 25 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977)).

■ The evidence is undisputed that Ramsey terminated Pierce Sales' distributorship and refused to sell Ramsey winches to Pierce Sales. The evidence is also undisputed that, following termination by Ramsey, Pierce Sales began to sell winches manufactured by other companies and continued to sell non-winch products, such as trailers and truck beds, that it had been selling prior to termination. Finally, the evidence is undisputed that Pierce Sales made more money following termination than it did before termination. Pierce Sales tried to demonstrate fact of damage, notwithstanding soaring post-termination profits, by showing that (1) post-termina-

tion profits were not attributable to the use of resources diverted from the sale of Ramsey products, but that they flowed from sales of truck beds and trailers which Pierce Sales would have made even if it had still been selling Ramsey winches;[24] (2) at any rate, but for termination, its volume of Ramsey sales would have increased over the volume it was sustaining immediately prior to termination so that Pierce Sales would have made more by selling Ramsey winches than it did by selling non-Ramsey winches, truck beds and trailers; and (3) regardless of the profits earned from substitute activities, whether winch sales or non-winch sales, Pierce Sales was damaged because it lost the ability to make winch sales in the interim between termination and obtaining substitute winch lines and increasing efforts with respect to non-winch products.

We think there is substantial evidence, sufficient to create a jury question, that Pierce Sales suffered injury from termination, in the form of lost winch sales, at least during the interim between termination and the full development of substitute activities. Since this evidence supports the jury's answer to interrogatory no. 3, that termination was a proximate cause of injury, the district court did not err by refusing to direct a verdict on the fact of damage issue. Evidence of this element of damages alone would be sufficient to sustain the jury's answer to special interrogatory no. 3.[25]

**24.** This fact of damage argument, of course, includes the claim that, though it did not divert resources used to sell Ramsey winches to the sale of substitute brand winches, Pierce Sales could not sell as many non-Ramsey winches as Ramsey winches.

Pierce Sales argues also that, as a matter of law, we should limit the fact of damage inquiry to "product line damages." Appellee's Brief at 29. Apparently, in arguing that its post-termination successes do not necessarily preclude damages, Pierce Sales maintains that we should only consider injury to the winch aspect of its business. We think this argument goes too far. We agree that, to the extent Pierce Sales did not divert resources from the sale of Ramsey winches to the sale of non-winch items, we should ignore successes in those non-winch endeavors.

We do not agree, however, that non-winch lines should be ignored as a matter of law. To the extent that a diversion of resources occurred, profits from non-winch lines should certainly be considered in determining if Pierce Sales has been damaged by termination of its Ramsey distributorship. *See, e.g., Golf City*, 555 F.2d at 436 (duty to mitigate by (1) obtaining product from another source or (2) increasing efforts in other product lines); *Borger*, 625 F.2d at 398 (proper measure of damages is "overall business loss"; "[t]o the extent that ... profits from the sale of other products increased as a result of diverted emphasis," [plaintiff] was not entitled to recover from [defendant] ).

**25.** As we said in *Multiflex*, 709 F.2d at 989:

There is substantial evidence that immediately following termination Pierce Sales lost profits from the termination of its Ramsey distributorship. George and Jeff Pierce both testified that, on the day that the distributorship was cancelled, they had expected to pick up an order of one hundred winches from the Ramsey plant. They further testified that many of those winches had been pre-sold. In fact, George Pierce testified that, when they returned to Henrietta from Tulsa, buyers were waiting for them. Over the next few months according to George Pierce, Pierce Sales was unable to fill orders that it received for Ramsey winches. Moreover, this testimony was supported by documentary evidence. Pierce Sales produced letters from its files in which it informed customers that, because of termination, it would be unable to fill their orders for Ramsey winches. Finally, there is evidence that it took a considerable amount of time for Pierce Sales to obtain winches from substitute manufacturers. We think this evidence is sufficient to create a jury question with respect to fact of damage.

Moreover, we think there is additional evidence of fact of damage. As noted, if non-winch sales rose without a diversion of resources from the sale of Ramsey winches, and if increased profits are attributable to non-winch sales, our fact of damage inquiry would be effectively limited to the winch end of Pierce Sales' business. George Pierce testified that Pierce Sales would have at least been able to maintain winch sales at pre-termination levels, while at the same time selling the same number of non-winch items that were actually sold following termination. Jeff Pierce corroborated this testimony. If the jury chose to credit this testimony, which it was free to do, there was ample additional evidence of fact of damage to sustain the answer to interrogatory no. 3. It was undisputed that prior to termination, Pierce Sales sold,

in its best month, over 250 Ramsey winches. Although Pierce Sales was a new Ramsey distributor, for each of the five months preceding that month, it sustained sales of over 150 Ramsey winches. The evidence showed, however, that, during the four years following termination, Pierce Sales sustained an average of less than 150 winch sales per month. This evidence, we think, was sufficient to create a jury question whether Pierce Sales lost winch sales as a result of termination.

### 2. *Amount of Damages.*

■ Having found evidence sufficient to sustain the jury's verdict as to fact of damage, we now evaluate, under a relaxed standard, the evidence supporting the award of $705,238.45. We are careful to note, however, that, even under the relaxed standard, a jury verdict based on speculation alone cannot stand. As we said in *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 46 (5th Cir.) (quoting *Bigelow*, 327 U.S. at 264, 66 S.Ct. at 579), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972):

In short, the law is clear: the courts are to take a charitable view of the difficulties of proving damages in a case when a treble-damage plaintiff must try to prove what would have accrued to him in the absence of the defendant's anticompetitive practice. *Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.*, (5th Cir.1967), 383 F.2d 97, 106. But this tolerant view is limited by our responsibility not to allow damages to be determined by "guess-work" or "speculation;" we must at least insist upon "a just and reasonable estimate of the damage based on relevant data."

We also note that an antitrust damage award may be based on assumptions and projections, "as long as the assumptions rest on adequate bases." *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d at

---

The fact of damage showing does not require the antitrust plaintiff to prove with particularity the full scope of profits that might have been earned in the absence of unlawful activity in restraint of trade. It requires only that a plaintiff show with some particularity an element of actual damage caused by the defendant's violations of the antitrust laws. (Citations omitted.)

24. *See also Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934, 955 (5th Cir.1975).

██ There are two generally recognized methods of proving lost profits: (1) the "before and after" method, which compares the profit record prior to the antitrust violation with that subsequent to it and (2) the "yardstick test," which "consists of a study of the profits of business operations that are closely comparable to the plaintiff's." *Lehrman*, 500 F.2d at 667. An antitrust plaintiff, of course, is not specifically limited to one of these two methods. A method of proof "specially tailored" to the individual case, if supported by the record, is acceptable. *Id.* at 668.

██ The jury returned a verdict in the exact sum suggested by Pierce Sales' expert. We must, therefore, examine his testimony carefully. *See Copper Liquor*, 506 F.2d at 951. We note at the outset that Pierce Sales' expert, Danny Moore, utilized a modified yardstick approach to Pierce Sales' damages. He based his estimate of damages on the number of Ramsey winches that, according to his projections, Pierce Sales could have sold but for termination. He did not, however, base projected sales on a comparison with the sales record of a Ramsey distributorship comparable to Pierce Sales. His projections, therefore, are necessarily based on several assumptions. Ramsey argues that the number and speculative nature of his assumptions rob his testimony of its probative value.[26]

Moore arrived at the figure of $705,238.45 as follows. He first calculated the gross profit per winch that Pierce Sales generated on the sale of Ramsey winches.[27] By subtracting cost-per-winch-sold[28] from gross profit-per-winch, he arrived at a net profit-per-winch factor of $35.11. Moore then projected the number of Ramsey winches that he felt Pierce Sales could have sold but for termination. He projected sales rising steadily from the near 250 winches that were actually sold in October of 1978 to a figure of 520 winches per month in December of 1979. At this point, his projected sales levelled off and he assumed Ramsey winch sales of 520 winches per month for the rest of the damage period. From projected sales, he subtracted the actual number of non-Ramsey winches that Pierce Sales sold. The result was a lost sales figure of 20,149.07 winches, which Moore then multiplied by the $35 net profit-per-winch factor to reach a grand total of $705,238.45.

We note first that there is ample evidence to support Moore's use of a $35 net profit-per-winch factor. Moore testified with some detail how he arrived at that figure from the actual business records of

26. Specifically, Ramsey argues that Moore assumed, without evidentiary support (1) that Pierce Sales' sales of Ramsey winches would continue to increase, at the same rate that they increased from April to November of 1978, until Pierce Sales reached a monthly total of 520 winches; (2) that non-winch sales should not be considered in determining lost profits, apparently because those sales were not generated by the diversion of resources from winch sales; (3) that market conditions, such as the recent recession, would have had no effect on sale of Ramsey winches; (4) that Ramsey would have been able to supply all the winches that he predicted Pierce Sales could sell; and (5) that Pierce Sales' sales of Ramsey winches would not have been affected by increased competition from other Ramsey distributors. Appellant's Brief at 21–31. Ramsey also attacks Moore's calculation of the profit-per-winch earned by Pierce Sales.

27. He calculated this figure by examining as a sample, 88 winch sales of the over two-hundred sales that occurred in the month of October of 1978. He matched the price received by Pierce Sales for each winch, as reflected on customer invoices, with the price paid by Pierce Sales to Ramsey for each winch, as reflected on Ramsey invoices. In this manner, he obtained a figure representing gross profit-per-winch.

28. Moore calculated the total indirect costs incurred by Pierce Sales for the month of October, such as rent and utilities, and allocated a portion of those costs to winch sales according to the ratio of winch sales to total sales for the month of October. He then determined that Pierce Sales incurred a total of $205.00 in direct costs related to winch sales, primarily for advertising. Total direct and indirect costs allocable to winch sales were then divided by the number of winches sold in October to arrive at a cost-per-winch factor.

Pierce Sales. Although the invoices underlying this calculation were not introduced into evidence, Moore presented them in court and they were available to Ramsey during cross-examination. Moreover, Moore testified that the $35 figure, although slightly lower, was generally consistent with a calculation of profit-per-winch derived from George Pierce's daily sales journal. Ramsey attacked this calculation at trial. Entwistle, Ramsey's expert, testified that relying on a sample of 88 winches to determine a per-winch profit figure was unrealistic. Entwistle calculated a per-winch profit figure of $3.20 by dividing the total number of winches sold in 1978 by the net profit reported on Pierce Sales' 1978 tax return. We think, however, that the evidence created a substantial question with respect to which expert's calculation was more accurate. Neither calculation is based upon pure speculation. Each side identified defects in the method used by the other. We are convinced that the choice between the two methods was properly left to the jury.

We have already touched briefly, in the fact of damage analysis, on a second major aspect of Moore's testimony. Moore apparently assumed that the increase in Pierce Sales' profits following termination was attributable, not to the fact that substitute brand winches were more profitable than Ramsey winches, but to increased profits from trailers and other non-winch items. He apparently further assumed that Pierce Sales would have been able to sustain the volume of non-winch items it sold even if its distributorship had not been terminated and it was enjoying the volume of Ramsey winch sales that he projected.[29] We think that there is evidentiary support for both of these assumptions, and that they were properly left to the jury to evaluate. Moore testified that, after examining

Pierce Sales' sales records and tax returns, he determined that Pierce Sales' profits increased because of trailer sales, not winch sales. Again, Moore had Pierce Sales' records with him and could have been cross-examined on this point. The Pierces testified as well that they would have been able to sustain both the projected Ramsey sales *and* the sales of trailers and truck beds that actually occurred. Although the question is a close one, we think this testimony constitutes enough to meet the relaxed burden that exists with respect to antitrust damages.

The most troubling aspect of Moore's damage model is his projection of the number of Ramsey winches that, but for termination, Pierce Sales would have been able to sell. As noted, his projected sales graph starts with the approximate number of Ramsey winches that Pierce Sales sold during its best month and climbs steadily to a level of 520 winches per month—close to 250 more winches per month than Pierce Sales has ever sold. We would be more comfortable with this projection if it had been tied to the history of a similar distributor—a "yardstick"—for comparison purposes. We note that there is evidence in the record that Ramsey winches are the "Cadillac" of winches. Still, there must be more evidence before we can say that a reasonable jury could find, based on product appeal, that Pierce Sales could sell so many more Ramsey winches than other winches.[30] As it is, Moore's explanation of the basis for his projections is unsatisfying and, we think, insufficient standing alone to support the jury verdict:

> We got a, based on the way sales were running for the period of time that the winches were sold, we determined a range that we felt comfortable was a range that would include what future

---

**29.** In other words, he did not use non-winch items in mitigation because they were not the result of efforts diverted from Ramsey sales.

**30.** George Pierce testified that Pierce Sales utilized the same advertising and other sales efforts with respect to non-Ramsey winches that it

did with respect to Ramsey winches. The only explanation for the difference in projected Ramsey sales and actual non-Ramsey sales, therefore, is (1) Ramsey product appeal or (2) inaccurate projections.

sales would have been based on everything that we looked at and sales that were made, and discussing with everyone that we could talk to at Pierce's Company and Pierce, and all these people, and then we used basically the lower line of that range, which would basically be a more conservative approach in determining what we felt like actual sales would have been in the future.

Record Vol. IV at 350–51. The only concrete support for the projection contained in this explanation is the statement that the projection is based in part on "the way sales were running." If this were the only support in the record for the projection, we would agree with Ramsey that it could not support the jury award.

There is, however, more in the record to support the projection. We summarize the additional support: (1) Ramsey officials told George Pierce that it was not uncommon for Ramsey distributors to make $300,000 per year; (2) George Pierce expressed the opinion that, with adequate supplies, Pierce Sales could sell 600 to 700 Ramsey winches per month; (3) around the time of termination, another Ramsey distributor projected sales of from 500 to 2000 winches per month.

Although this is certainly a close question, we find this evidence sufficient to support the verdict. The defects that Ramsey points out in the damages model were also pointed out to the jury. Moreover, Ramsey's argument that a sales projection based on so short a period is unrealistic is unavailing. Ramsey's conduct is directly responsible for the short sales history upon which Moore's damage model is based. We think, although the evidence is not sufficient by much, there is enough evidence here to support the jury's verdict.

## V. CONCLUSION.

For the reasons set forth above, the judgment is affirmed.

AFFIRMED.